Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/02/2022 08:06 AM CDT

STATE OF NEBRASKA, APPELLANT AND
CROSS-APPELLEE, V. JAKE J. MCGOVERN,
APPELLEE AND CROSS-APPELLANT.

___ N.W.2d ___

Filed June 10, 2022.    No. S-21-144.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Sentences: Appeal and Error.** Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse of the trial court's discretion.

3. **Judgments: Appeal and Error.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

4. **Search and Seizure: Search Warrants: Probable Cause.** A warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.

5. **Search Warrants: Probable Cause.** What will constitute sufficient particularized information to support probable cause that a cell phone or cell phone information searched will contain evidence of a crime depends upon the nature and circumstances of the crime and what is sought in the warrant.

6. **Search Warrants: Affidavits: Probable Cause.** A search warrant, to be valid, must be supported by an affidavit which establishes probable cause.

7. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test. The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

8. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched.

9. **Search Warrants: Affidavits: Evidence: Appeal and Error.** In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.

10. **Search Warrants: Affidavits: Probable Cause.** A warrant affidavit must always set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of probable cause.

11. **Criminal Law: Search and Seizure: Evidence.** The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.

12. **Probable Cause: Police Officers and Sheriffs.** Probable cause may be based on commonsense conclusions about human behavior, and due weight should be given to inferences by law enforcement officers based on their experience and specialized training.

13. **Search Warrants: Probable Cause: Appeal and Error.** A judge's determination of probable cause to issue a search warrant should be paid great deference by reviewing courts.

14. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs.** To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.

15. **Search Warrants.** The degree of specificity required in a warrant depends on the circumstances of the case and on the type of items involved.

16. **Constitutional Law: Search and Seizure.** A brief examination of all electronic data associated with a cell phone is usually necessary in order to find where the information to be seized is located, and such examination is reasonable under the Fourth Amendment.

17. **Search Warrants: Affidavits.** An inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant.

18. **Constitutional Law: Search Warrants.** The most important constraint in preventing unconstitutional exploratory rummaging is that the warrant limit the search to evidence of a specific crime, ordinarily within a specific time period, rather than allowing a fishing expedition for all criminal activity.

19. **Constitutional Law: Search and Seizure: Evidence.** The exclusionary rule operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.

20. **Search Warrants: Police Officers and Sheriffs.** When a search warrant has been issued, the applicability of the good faith exception turns on whether the officers acted in objectively reasonable good faith in reliance on the warrant.

21. **Search Warrants: Affidavits: Police Officers and Sheriffs: Appeal and Error.** In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.

22. **Motions to Suppress: Search Warrants: Affidavits: Police Officers and Sheriffs: Evidence.** Under the good faith exception to the exclusionary rule, evidence may be suppressed if (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his or her reckless disregard for the truth, (2) the issuing magistrate wholly abandoned his or her judicial role, (3) the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.

23. **Warrantless Searches: Police Officers and Sheriffs.** Under the plain view doctrine, if police officers are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.

24. **Constitutional Law: Search and Seizure.** The ultimate touchstone of the Fourth Amendment is reasonableness.

25. **Evidence.** Under the independent source doctrine, challenged evidence is admissible if it came from a lawful source independent of the illegal conduct.

26. **Sentences: Statutes: Appeal and Error.** In reviewing whether a sentencing court abused its discretion in imposing a sentence that was excessively lenient, an appellate court is guided by the factors set forth by Neb. Rev. Stat. § 29-2322 (Reissue 2016), as well as by the statutory guidelines set out for the direction of the sentencing judge in imposing or withholding imprisonment.

27. **Sentences.** Evidence regarding a defendant's life, character, and previous conduct, as well as prior convictions, is highly relevant to the determination of a proper sentence.

28. \_\_\_\_. A sentencing court must have some reasonable factual basis for imposing a particular sentence.

Appeal from the District Court for Hall County: Mark J. Young, Judge. Affirmed.

Douglas J. Peterson, Attorney General, and Austin J. Relph, for appellant.

Sarah A. Hinrichs, Deputy Hall County Attorney, for appellant.

Jonathan Hendricks, of Dowding, Dowding, Dowding & Urbom, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

## I. INTRODUCTION

This criminal case appeal presents two primary issues: whether evidence obtained following a search of a cell phone should have been suppressed and whether a sentence of probation for a Class II felony was excessively lenient. Because the first search warrant was supported by probable cause and was sufficiently particular and because law enforcement reasonably saw evidence of a different crime during the initial search, the court did not err in overruling a suppression

motion. And because the overall sentencing was not an abuse of discretion, we affirm the judgment of the district court.

## II. BACKGROUND

### 1. Initial Incident

On September 25, 2018, just after 6 a.m., Officer Brad Newell was dispatched to an apartment in Kearney, Nebraska. Newell spoke with J.S., who reported that upon leaving his garden-level apartment, he saw a man crouched down by a window to the apartment's bathroom. The window had blinds, but they had a small gap. When J.S. went outside, J.S.' girlfriend had just entered the bathroom to shower. J.S. did not mention seeing the individual holding a cell phone. J.S. told Newell that he yelled at the person, who then "took off" running. J.S. chased the person and saw him cut through a yard.

Newell asked J.S. to show him the path the person took. Approximately half a block from the apartment, J.S. discovered a cell phone and handed it to Newell. After observing that the phone's screen was locked, Newell took the phone to the police station. Newell met with Investigator Dan Warrington, who assisted Newell in preparing an affidavit to search the phone.

### 2. September 2018 Search Warrant and Investigation

#### (a) Affidavit

Newell completed an affidavit in support of a search warrant, asking the judge for permission to examine the cell phone for evidence of the crime of unlawful intrusion on September 25, 2018. In the affidavit, Newell stated that he had investigated many crimes where a cell phone contained evidence of the commission of the crime being investigated.

In the affidavit, Newell set forth information obtained from J.S. concerning the incident. J.S. reported that on September 25, 2018, "shortly before 0604 hours," his girlfriend said that she was going to shower. As J.S. left the apartment building,

he saw a man looking into the ground-level window to the bathroom of J.S.' apartment, where J.S.' girlfriend was preparing to shower. J.S. observed the man "crouched down at the window with his head lowered so that he could see through a small area in the window blinds where one of the blind slats was missing." J.S. yelled at the man, who then fled. J.S. chased the man and observed him run through a yard and then run south. After Newell was dispatched to J.S.' apartment, he and J.S. retraced the man's path of flight. In doing so, J.S. located a cell phone "right where the suspect ran."

Newell observed J.S. locate the cell phone and took custody of it for evidentiary purposes. Newell believed the phone "may contain evidence of the crime of Unlawful Intrusion, whereby the suspect viewed [J.S.' girlfriend] in a state of undress, and may have also captured photographs and or video of [her] in a state of undress." Newell also stated that the cell phone would contain evidence of the subscriber of the phone's account, who could be the suspect. Newell further confirmed that the window was to the bathroom of J.S.' apartment and that "there was a void in the blinds where a person could see into the bathroom area."

Warrington supplied Newell with a template he used for a cell phone search, and Newell incorporated that language into the affidavit. The affidavit stated that according to Warrington, "it has become commonplace for individuals to communicate with others using cellular telephones or other electronic devices to communicate activities, develop plans, coordinate schedules and to otherwise pass along information in a variety of formats." Warrington had over 400 hours of training regarding forensic searches of electronic devices.

Warrington would testify that there are two general types of data extractions from electronic devices using computer software programs. In a logical extraction, the software "makes read-only requests of specific data to the device" and the device responds by extracting the designated information. The logical extraction is limited in scope and is unable to

access photographs or messages stored in third-party applications, to access information stored in a folder different from the default folder, or to access deleted items. In contrast, a physical extraction is comprehensive and "captur[es] a complete picture of the usage and contents of an electronic device." A physical extraction creates a copy of the device's flash memory.

Based on this information, Newell requested a search warrant to examine the cell phone for evidence relating to unlawful intrusion. Newell set forth that the examination may include searching the phone for the following:

> Data that may identify the owner or user of the above-described cellular phone including the phone number assigned to the phone; Call Histories and logs (missed, incoming and outgoing); Photographs and their associated metadata; Contact lists and address books; Calendar entries; Messages (SMS, MMS, Recorded Messages, iMessages, or Messages communicated through other third-party application(s)) contained in any place throughout the device; Audio and video clips; Global Positioning System data including, but not limited to coordinates, waypoints and tracks, Documents and other text-based files; Internet world wide web (WWW) browser files including, but not limited to, browser history, browser cache, stored cookies, browser favorites, auto-complete form history and stored passwords; Email messages and attachments (whether read or unread) accessible from the cellular phones listed above; Access and search for communication on any third-party applications located on the above-described cellular phones; and, any deleted and/or unallocated content relating to the above-described types of information.

### (b) Warrant

A Buffalo County Court judge signed a search warrant the same day. According to the search warrant, the issuing judge was satisfied that probable cause existed based upon

the affidavit "attached hereto and made a part hereof by reference." The warrant allowed for a search of all of the above-quoted categories of cell phone data and any "SD [c]ards" located within the device for "evidence relating to the offenses of **Unlawful Intrusion**."

(c) Search

Newell returned to the police station and provided Warrington with a copy of the signed warrant. Warrington then extracted data from the phone. After extracting the contents of the phone, he used software to examine the data. The software categorized the data, and one of the categories was "user profiles." Before the end of the day, Warrington provided Newell with the name of the phone's user: Jake J. McGovern.

The software also pulled together anything identified as a possible image and placed it in a gallery. Warrington searched all imagery on the device by clicking on the tab for photographs. None of the images appeared to be taken through a window or a missing blind slat. He did not locate any photographs taken during the September 25, 2018, event.

The following day, Warrington performed an additional extraction of the phone. In the images folder, Warrington found imagery of women in a state of undress. Those images appeared to be "thumbnails" from videos on the device. Warrington selected a tab in the software for videos and tried to match the thumbnails to a video based on file names.

After observing women in a state of undress, Warrington reviewed the phone's "search web history." He explained, based on his training and experience, that law enforcement will find files or search history associated with a possible crime that the user could be committing. Warrington located several items such as "spy bathroom" and "voyeur bathroom," which were consistent with unlawful intrusion.

Because Warrington observed women in a state of undress, which was consistent with what one could be looking for in the offense of unlawful intrusion, he continued to examine

the videos on the phone. Warrington observed imagery of a woman who appeared to be nude and sleeping. One video showed a woman who appeared to be sexually assaulted while unconscious. Some of the videos had "2017" in the title, indicating a possibility that the video was recorded in 2017.

After watching the videos, Warrington was aware that a potential sexual assault was involved. He next tried to identify the victim and to determine whether the event occurred in Kearney. To make the identification, Warrington testified: "I began looking at the complete totality of all of the data associated with the video and image files which consisted of, yes, the date and time stamps. It consisted of the metadata. It consisted of the files themselves." He used that information to determine whether the date and time stamps could be accurate. Warrington then examined communication that may have occurred during the timeframe that the videos and images had been produced and located text messages and communication with a particular woman prior to that incident. Warrington testified that there was a "[p]ossibility" that he could have validated the date stamps prior to playing the videos.

Law enforcement identified the possible victim as K.S., a woman who lived in Grand Island, Hall County, Nebraska. Members of the Kearney Police Department traveled to Grand Island to speak with K.S. In an interview, K.S. said that she had been in a relationship with McGovern from October 2017 to January 2018. It was established that the touching in the videos occurred in Grand Island.

Kearney law enforcement officers provided a Grand Island police sergeant with a "CD" which contained the download of the cell phone recovered in Kearney, along with a copy of the search warrant and affidavit from Buffalo County. The sergeant thereby gained access to the download, which included a video depicting a woman in an unconscious state with her clothes being removed and sexual contact occurring. He began investigating a potential sexual assault, which was believed to have occurred in Grand Island in October

2017. In looking through the contents of the device, the sergeant was not attempting to find any information regarding the September 2018 Kearney incident. Prior to opening the contents of the phone, no one with the Grand Island Police Department received a search warrant other than the search warrant obtained by the Kearney Police Department.

An intelligence research specialist employed by the Grand Island Police Department performed an analysis of the evidence retrieved by the Kearney Police Department. Although the Kearney search warrant, signed September 25, 2018, stated that a search of the device had to occur in the next 30 days, the specialist examined the device's contents on October 29. In examining the cell phone extraction CD, he found an "associated Google Gmail address." The specialist prepared a search warrant to send to Google LLC, and a Hall County judge issued a warrant. Because the arguments on appeal are not directed to this warrant or the resulting search, we will not further discuss it.

The State subsequently charged McGovern in Hall County with two counts of sexual assault in the first degree, one count of sexual assault in the third degree, and three counts of recording a person in a state of undress. The State identified K.S. as the victim of each count.

### 3. First Motion to Suppress

McGovern moved to suppress any information gathered from his cell phone. McGovern alleged that Newell's application for a search warrant lacked probable cause to justify a search of the phone's contents other than for subscriber information. He asserted that members of the Grand Island Police Department improperly searched the contents of his phone without first obtaining a warrant to do so.

During a hearing on the motion to suppress, Warrington agreed that the search warrant affidavit included "a much more broad swath of the phone" than just photographs, videos, or user information. He generally agreed that the template

listed "all of the different areas of a phone." Having performed the majority of cell phone searches in Kearney, Warrington testified that he uses a template when he prepares an affidavit seeking to search a cell phone and that typically, the only information that changes from case to case are the device information and the particular crime being investigated.

Warrington understood that he was looking for photographs or videos of the event occurring in Kearney on September 25, 2018. But he testified that he was also looking for data on the phone that may be consistent with the crime. Warrington explained that "the same unlawful intrusion could have been committed days before" and that "there could be search histories in regards to . . . how to conduct voyeurism."

Warrington testified that prior to opening a video, he would "look at the totality of all of the data." That included looking at the file name and metadata that may be available. Warrington testified that some files do not have metadata and that "the ultimate last thing to do is to examine the actual video itself and see if it matches anything that you are looking for." According to Warrington, there was "a possibility" that the file names of the relevant videos were time and date stamps. But Warrington explained that file names can easily be renamed, moved, or modified; thus, he "[did not] put a lot of credit necessarily into the exact file name." Warrington stated that he had to be able to look in all of the different locations within a phone, because of how movable the data is. For example, a video may be found in the video section, in the messaging section, or in a third-party application. And he testified that because videos could be edited, he had to watch them in their entirety to determine whether they were of the September 2018 event.

McGovern hired Shawn Kasal, a digital forensic analyst, to review the contents of the cell phone. Kasal was provided with a copy of the search warrant and affidavit and was granted access to the extraction of the phone conducted by Warrington.

Kasal opened the video folder on the software and "put it in table view." He explained that table view provides the most information about the contents and files, such as where a file may have been stored on the phone and its "modified or created time date stamp."

Focusing on videos in the video folder beginning with the titles "20171022," "20171028," and "20171111," Kasal was asked if—after looking at the files' titles, metadata, and thumbnails—he was able to rule them out as being videos of the September 25, 2018, incident. He answered, "By my understanding of the time dates ascribed to the videos in question, they were roughly 340 to 350 days previous to the issuance of the warrant."

Kasal testified that after watching the entirety of the videos, he determined that they did not match the description of the crime scene identified in the warrant. When asked if he was able to make that determination prior to watching the videos, Kasal answered that he "needed to watch the entire video to make sure that it had not been edited, spliced or otherwise modified to include any of that data."

In March 2020, the court considered McGovern's motion to suppress. The court acknowledged McGovern's argument that the warrant was overbroad and lacked particularity. It stated that the application and affidavit sought "to search a laundry list of cell phone functions and data" and that "[n]o particular effort was made by the officer to articulate what items of possible evidentiary value could be found in the call logs, address book, calendar and et cetera."

But the court turned its attention to McGovern's argument that law enforcement should have sought a second search warrant to recover evidence regarding the crime in Hall County. The court stated that

> based upon the expert testimony presented, the officer in Kearney had every right to initially view all videos contained on the phone to ensure that the file dates and time stamps were accurate, however, once Officer

Newell viewed evidence indicating there was evidence of a further crime in Hall County, Nebraska, a second search warrant should have been applied for outlining the types of evidence which would have been relevant for the Hall County case.

The court granted the motion and suppressed the evidence. The State did not appeal the suppression order.[1]

### 4. March 2020 Search Warrant

Later in March 2020, Warrington filed an affidavit in support of a search warrant. The affidavit discussed the discovery of the cell phone, the September 2018 search warrant, and the extraction and examination of the phone's data. Warrington's affidavit stated that during the 2018 examination, he observed "recent web history consistent with voyeurism and unlawful intrusion" and videos that were consistent with the crime of first degree sexual assault. Warrington stated that "further examination of the cellular phone would be necessary in determining further evidence of the crime of 1st Degree Sexual Assault, identity of the victim or victims, as well as the location and date of the offenses." Thus, he requested issuance of a search warrant for a cell phone belonging to McGovern and authorization for law enforcement to examine the phone for evidence relating to first degree sexual assault.

A Buffalo County Court judge issued a search warrant the same day. An officer extracted data from the cell phone, and Warrington examined the extraction sometime in April 2020. He did not find evidence different from what he discovered following the first extraction.

### 5. Second Motion to Suppress

McGovern thereafter filed a second motion to suppress. He sought to suppress all evidence from the search of the cell phone. During a hearing on the motion, Warrington

---

[1] See Neb. Rev. Stat. § 29-824 et seq. (Reissue 2016).

testified that he was aware of the suppression order when he applied for the warrant in March 2020. In seeking the warrant, Warrington asked for legal authority to re-examine the device for additional evidence. He essentially wanted to look at the exact same data that he had looked at in 2018.

The district court overruled the motion to suppress. The court found that the initial review of all of the videos on McGovern's phone pursuant to the first search warrant was a lawful search and that "the videos were first seen in 'plain view.'" The court reasoned that "[b]ecause the lawful viewing showed evidence of another possible crime, law enforcement's second search under the second search warrant is not unlawful exploitation of a prior illegality . . . ."

## 6. Bench Trial

Prior to the start of trial, the State filed an amended information charging McGovern with sexual assault in the first degree, sexual assault in the third degree, and recording a person in a state of undress. Pursuant to McGovern's waiver of a jury trial, the court conducted a bench trial on the amended information.

At trial, McGovern renewed both of his motions to suppress. He objected to any evidence concerning the contents of the cell phone. He asserted that the September 2018 search warrant (1) was overbroad and lacked sufficient particularity, (2) lacked sufficient probable cause to search the device for photographs or videos, and (3) was exceeded in scope by law enforcement. As to the March 2020 search warrant, McGovern objected that it (1) was granted upon an affidavit that contained information gathered as a product of a prior unconstitutional search, (2) was used by law enforcement to reobtain information and evidence that had been previously discovered pursuant to an unconstitutional search and that had been suppressed by the court, and (3) was not the product of an independent source, inevitable discovery, attenuation, or other justification that would make the evidence properly admissible.

The court overruled the objections but granted a continuing objection to preserve the concerns raised in the motions to suppress. The court stated that the central issue was whether the State could "cure the defects identified in the first search warrant by issuing a second search warrant or requesting getting a second search warrant" and that it would stand on its ruling that the State had the ability to cure.

The trial proceeded on exhibits received by the court. According to investigative reports, K.S. confirmed that she was the woman in videos found on McGovern's phone and that the videos were taken in Grand Island. She denied giving McGovern permission to take such intimate images of her. At least one video showed digital penetration while K.S. was in a state of unconsciousness. The court convicted McGovern of each count alleged in the amended information.

## 7. Sentencing

For the convictions for sexual assault in the third degree and for recording a person in a state of undress, the court imposed sentences of 1 year's imprisonment, to be served concurrently. As to the sexual assault in the first degree conviction, the court found that McGovern was a fit and proper candidate for probation and imposed a term of 60 months of Community-Based Intervention probation. It found that periodic confinement in the county jail as a condition of probation was necessary, "because a sentence of probation without a period of confinement would depreciate the seriousness of the offender's crime or promote disrespect for the law." Thus, the court ordered jail time of 90 days to be served consecutively to any other sentence imposed.

The State appealed, and McGovern filed a cross-appeal.

## III. ASSIGNMENTS OF ERROR

The State's appeal focuses only on sentencing. Because McGovern's cross-appeal addresses admissibility of cell phone evidence, we begin there.

First, McGovern assigns that the initial search warrant affidavit lacked the requisite showing of probable cause and that the warrant was not sufficiently particular.

Second, McGovern assigns that the court erred in overruling his second motion to suppress. This broad assignment has three prongs. First, he attacks the use of information gathered by means of the first warrant to support the second one. Next, he disputes the court's application of the "plain view" doctrine. Finally, he urges that no exclusionary rule exception—such as independent source, inevitable discovery, or attenuation—applies.

The State's appeal assigns that the court abused its discretion by imposing excessively lenient sentences. It focuses on the sentence to probation for first degree sexual assault.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[2]

[2,3] Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears to be an abuse of the trial court's discretion.[3] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[4]

---

[2] *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021), *cert. denied* ___ U.S. ___, 142 S. Ct. 1155, 212 L. Ed. 2d 34 (2022).

[3] *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019).

[4] *Id.*

## V. ANALYSIS

### 1. Suppression

McGovern's assignments of error largely invoke well known Fourth Amendment principles. The State's response articulates two alternate theories of admissibility. In one, the State assumes that the first warrant was invalid but argues that the good faith exception applied. The other—which is more complex—begins with the proposition that the first warrant was at least partially valid and that portions of the challenged evidence were properly viewed. The State then argues that the properly viewed evidence supported issuance of the second warrant, which, the State asserts, was an independent source for the rest of the challenged evidence.

We will address the parties' specific arguments invoking familiar principles. But before doing so, we note the special challenges presented by searches of cell phones.

### (a) Cell Phone Searches

Cell phones are "minicomputers" with "immense storage capacity."[5] They "collect[] in one place many distinct types of information . . . that reveal much more in combination than any isolated record."[6] Further, "[a]lthough the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different."[7]

Two approaches with respect to digital evidence searches have emerged.[8] One is to view a digital device, such as a cell phone, as a filing cabinet or form of a container and the data thereon as forms of documents.[9] The other calls for "a

---

[5] *Riley v. California*, 573 U.S. 373, 393, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014).

[6] *Id.*, 573 U.S. at 394.

[7] *Id.*, 573 U.S. at 395.

[8] Thomas K. Clancy, The Fourth Amendment, Its History and Interpretation § 12.4.8 (3d ed. 2017).

[9] See *id.*

'special approach,' requiring unique procedures and detailed justifications, including rejecting the container analogy."[10]

Under the filing cabinet or container approach, courts "look to traditional means to limit the scope of document searches, such as the nature of the criminal activity alleged or the nature of the objects sought."[11] But "a consequence of this view is the potential exposure of vast amounts of data for at least cursory examination if the object of the search could be in a digital format."[12]

A method of the special approach would be "use of the particularity requirement to mandate preauthorization: a search warrant seeking to seize [digital devices] must specify that it covers such items."[13] The search may need to be limited by taking actions such as "'observing file types and titles listed on the directory, doing a key word search for relevant terms, or reading portions of each file stored in the memory.'"[14]

[4,5] This court has not explicitly adopted either approach. We have declared that a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.[15] What will constitute sufficient particularized information to support probable cause that a cell phone or cell phone information searched will contain evidence of a crime depends upon the nature and circumstances of the crime and what is sought in the warrant.[16]

It can be generally recognized that cell phones tend to accompany their users everywhere, and thus, it may be

---

[10] *Id.* at 821.

[11] *Id.* at 818-19.

[12] *Id.* at 820-21.

[13] *Id.* at 821.

[14] *Id.* at 822.

[15] *State v. Short, supra* note 2.

[16] *Id.*

inferred that a suspect's cell phone probably accompanied the suspect at the time of the crime.[17] But we have cautioned that law enforcement cannot rely solely on the general ubiquitous presence of cell phones in daily life, or an inference that friends or associates most often communicate by cell phone, as a substitute for particularized information to support probable cause that a specific device contains evidence of a crime.[18]

### (b) First Search Warrant

McGovern raises two main issues with respect to the initial search warrant. He claims that the warrant was not supported by probable cause and that it lacked sufficient specificity.

The text of the Fourth Amendment contains three requirements pertaining to the content of a warrant, but only two are contested here. It states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[19] The requirements of probable cause and particularity—the two at issue—are analytically distinct, but closely related.[20]

### (i) Probable Cause

[6,7] A search warrant, to be valid, must be supported by an affidavit which establishes probable cause.[21] In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test.[22] The question is whether, under the totality of the circumstances illustrated

---

[17] *Id.*

[18] See *id.*

[19] U.S. Const. amend. IV. Accord Neb. Const. art. I, § 7.

[20] See *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

[21] *State v. Hidalgo*, 296 Neb. 912, 896 N.W.2d 148 (2017).

[22] *State v. Said, supra* note 20.

by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[23]

[8,9] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched.[24] In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.[25]

Regarding probable cause, McGovern makes a concession. He concedes that it existed to search the cell phone in order to determine its owner or user. Newell stated in the affidavit that the cell phone would "contain evidence of the subscriber of the cellular telephone account, who could be the suspect in the crime."

McGovern contends, however, that the warrant was unsupported by probable cause to search the phone for photographs and videos. We disagree.

[10] A warrant affidavit must always set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of probable cause.[26] Here, the affidavit set forth that J.S. observed a man looking into the ground-level window to the bathroom of J.S.' apartment, where J.S.' girlfriend was preparing to shower. J.S. yelled; the man fled. Upon retracing the man's path of flight, J.S. found a cell phone "right where the suspect ran." Newell stated in the affidavit that he believed the cell phone "may contain evidence of the crime of Unlawful Intrusion, whereby the suspect

---

[23] *Id.*

[24] *State v. Short, supra* note 2.

[25] *State v. Said, supra* note 20.

[26] *State v. Short, supra* note 2.

viewed [J.S.' girlfriend] in a state of undress, and may have also captured photographs and or video of [her] in a state of undress."

[11] The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.[27] It is true that J.S. did not report seeing the suspect holding a phone as the suspect was "crouched down at the window with his head lowered," likely viewing J.S.' girlfriend in a state of undress.

[12] Probable cause may be based on commonsense conclusions about human behavior, and due weight should be given to inferences by law enforcement officers based on their experience and specialized training.[28] One reasonable inference is that a person seeking to surreptitiously view another in a state of undress may capture that viewing by video or photograph. Discovery of the cell phone on the suspect's path of flight gives rise to an inference that the phone was not secured on the suspect's person—that the suspect "had it out," in Newell's words—and that perhaps it was used as the suspect peered into the bathroom.

[13] "Probable cause 'is not a high bar.'"[29] A judge's determination of probable cause to issue a search warrant should be paid great deference by reviewing courts.[30] Under the totality of the circumstances, we conclude the issuing judge had a substantial basis for finding the affidavit established probable cause to search the phone for photographs or videos of the September 25, 2018, incident.

---

[27] *Id.*

[28] *Id.*

[29] *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586, 199 L. Ed. 2d 453 (2018).

[30] *State v. Short, supra* note 2.

### (ii) Particularity and Breadth

[14,15] To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.[31] The degree of specificity required in a warrant depends on the circumstances of the case and on the type of items involved.[32]

McGovern challenges the first warrant's particularity and breadth. He quotes Ninth Circuit cases explaining that "'[p]articularity is the requirement that the warrant must clearly state what is sought'" while "'[b]readth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.'"[33]

McGovern first points out that the warrant authorized a search of every category of information that could be stored on a cell phone. But this circumstance does not necessarily lead to the conclusion that McGovern seeks.

[16] We have rejected arguments that an expansive list of areas to be searched encompassing practically the entirety of the data contained within a cell phone were insufficiently particular.[34] In doing so, we have recognized that officers cannot predict where evidence of a crime will be located in a cell phone or call records or in what format, such as texts, videos, photographs, emails, or applications.[35] And we have stated that there is no way for law enforcement to know where in the digital information associated with cell phones it will find evidence of the specified crime.[36] Consequently, we

---

[31] *Id.*

[32] *Id.*

[33] Brief for appellee on cross-appeal at 32, quoting *U.S. v. Hill*, 459 F.3d 966 (9th Cir. 2006), and *U.S. v. Towne*, 997 F.2d 537 (9th Cir. 1993).

[34] See, *State v. Short, supra* note 2; *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

[35] *State v. Short, supra* note 2.

[36] See *id.*

recently stated that "a brief examination of all electronic data associated with a cell phone is usually necessary in order to find where the information to be seized is located, and such examination is reasonable under the Fourth Amendment."[37] Thus, McGovern's first argument regarding particularity lacks merit.

McGovern also challenges the warrant's lack of any temporal limitation on the scope of the search. The face of the warrant did not limit the search to any timeframe, even though the warrant was sought in response to an incident occurring on a known date and approximate time.

[17] But the warrant referred to an attached affidavit, and the supporting affidavit recounted that the incident occurred "on the morning of September 25, 2018 shortly prior to 0604 hours." An inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant.[38] The affidavit and the warrant, read together, limited the scope of the search to a particular date.

[18] The most important constraint in preventing unconstitutional exploratory rummaging is that the warrant limit the search to evidence of a specific crime, ordinarily within a specific time period, rather than allowing a fishing expedition for all criminal activity.[39] Here, the warrant named a specific crime, the incorporated affidavit identified a time period, and both documents listed specific areas of the phone to be searched.

The nature of the crime—unlawful intrusion—limited the scope of the search; law enforcement officers knew they were to search for evidence regarding the device's owner or user along with such things as photographs and videos. The

---

[37] *Id.* at 139, 964 N.W.2d at 316.

[38] *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019).

[39] *State v. Short, supra* note 2.

warrant also listed specific areas to be searched within the cell phone, which were consistent with those described in the affidavit. We reject McGovern's argument that the first search warrant did not satisfy the particularity requirements of the Fourth Amendment.

### (iii) Good Faith

The State argues that even if the first warrant was invalid, a good faith exception applies. We first recall the rationale for the exclusionary rule and then turn to the application of good faith exception here.

### a. Exclusionary Rule

[19] The Fourth Amendment does not expressly preclude the use of evidence obtained in violation of its commands.[40] Rather, the exclusionary rule operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.[41] The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.[42] To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, as exclusion serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.[43]

The exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree.[44]

---

[40] *State v. Kruse*, 303 Neb. 799, 931 N.W.2d 148 (2019).

[41] *Id.*

[42] See *id.*

[43] *State v. Short, supra* note 2.

[44] *Utah v. Strieff*, 579 U.S. 232, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016).

In situations where the exclusion as a remedy would not deter law enforcement, several exceptions to the exclusionary rule have been recognized.[45] One is the exception for good faith upon which the State relies.

### b. Good Faith Exception Applied

[20,21] When a search warrant has been issued, the applicability of the good faith exception turns on whether the officers acted in objectively reasonable good faith in reliance on the warrant.[46] In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.[47]

[22] Under the good faith exception to the exclusionary rule, evidence may be suppressed if (1) the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his or her reckless disregard for the truth, (2) the issuing magistrate wholly abandoned his or her judicial role, (3) the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that the executing officer cannot reasonably presume it to be valid.[48]

McGovern does not assert that the issuing judge was misled by information in the affidavit. The first ground for suppression does not apply.

[45] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020), *cert. denied* ___ U.S. ___, 141 S. Ct. 432, 208 L. Ed. 2d 128.

[46] *State v. Kruse, supra* note 40.

[47] *Id.*

[48] *Id.*

Although McGovern argues that the issuing judge wholly abandoned his judicial role, we disagree. As we have already concluded, the affidavit provided probable cause to search the phone for photographs and videos relevant to the initial event. The second circumstance likewise does not apply.

The probable cause presented by the affidavit also defeats the third ground for suppression. This is particularly true in light of McGovern's concession.

McGovern argues that the fourth ground—facial deficiency precluding an executing officer from reasonably presuming the warrant's validity—applied "because law enforcement's over-reliance on templates had caused the situation to exist"[49] and "[l]aw enforcement could not reasonably presume the matching untailored template warrant, clearly overbroad in scope, was valid."[50] The State concedes that the "warrant could have been drafted better" but argues that the warrant "identified the offense being investigated, delineated the areas of the cell phone to be searched, and did not contain . . . catch-all language."[51] We are not persuaded that the fourth ground for suppression applies here.

### (c) Second Motion to Suppress

McGovern argues that the court erred in overruling his second motion to suppress for three reasons. His first reason requires little discussion. We discuss each in turn.

Before doing so, we recall specific factual findings of the district court. The court found that the Kearney Police Department received a search warrant to search the cell phone for evidence regarding unlawful intrusion and that during the course of the search, law enforcement officers discovered video evidence they believed tied McGovern to crimes in Hall County. Having reviewed these findings of fact for clear

---

[49] Brief for appellee on cross-appeal at 40.

[50] *Id*. at 41.

[51] Brief for appellant on cross-appeal at 19.

error, we find none. With these facts in mind, we turn to whether they trigger or violate Fourth Amendment protections.

### (i) Probable Cause and Particularity of First Warrant

First, McGovern repeats his argument that the first search warrant was unsupported by probable cause and lacked particularly. Based on that argument, McGovern contends that all evidence flowing from the search should be excluded. Because we have already rejected McGovern's probable cause and particularity challenges to the first warrant, this argument fails.

### (ii) Probable Cause for Second Warrant

Second, McGovern argues that the probable cause forming the basis of the second warrant was gathered at a time law enforcement was outside the scope of the initial warrant and was not in plain view. The State makes a conclusory statement that the videos were in plain view; however, its principal argument is that the videos were within the scope of the warrant.

### a. Plain View

The district court found that the initial review of all of the videos on the phone was a lawful search under the initial search warrant and that the videos were first seen in plain view. The court reasoned that because the lawful viewing showed evidence of another possible crime, the later search under the second search warrant was not an unlawful exploitation of a prior illegality. This presents a question of law, which we review independently of the trial court's determination.[52]

[23] It is well established that under certain circumstances, law enforcement may seize evidence in plain view without a warrant.[53] Under the plain view doctrine, if police officers are lawfully in a position from which they view an object,

---

[52] See *State v. Short, supra* note 2.

[53] *State v. Andera*, 307 Neb. 686, 950 N.W.2d 102 (2020).

if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.[54] When those circumstances are met, "'[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'"[55] But "the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."[56]

Here, the search warrant authorized law enforcement to search photographs and videos. Warrington testified—and McGovern's expert agreed—that it was necessary to watch the entirety of the videos to determine whether they matched the description of the September 2018 event. Warrington was lawfully in a position to view photographs and videos when he did so. Warrington testified that as he looked through the thumbnails in the video folder, he did not immediately notice a nonconsensual encounter. However, when he watched the actual video, it was immediately apparent to him that the woman was not conscious. Further, Warrington had probable cause to look through the images and videos for unlawful intrusion; thus, he had a lawful right of access to watch the videos in order to perceive whether they were relevant.

Whether the plain view doctrine should apply to digital information stored on a cell phone is a difficult question. In an electronic search of a cell phone, an unprecedented amount of personal information may come within the plain view of an investigator.[57] Such searches, like computer file

---

[54] *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). Accord *State v. Andera, supra* note 53.

[55] *Texas v. Brown*, 460 U.S. 730, 738, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983).

[56] *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

[57] See *State v. Bock*, 310 Or. App. 329, 485 P.3d 931 (2021).

searches, "present 'a heightened degree' of intermingling of relevant and irrelevant material."[58]

A consequence of analogizing cell phones to filing cabinets or to containers is that "in any legitimate search that permits looking at digital data, potentially all data can be examined to ascertain what it is."[59] Recently, the Oregon Court of Appeals determined that the breadth of a cell phone search made the plain view doctrine inapplicable where state agents, searching for location data, examined each photograph on a cell phone.[60] A different approach, a commentator suggested, would be to impose a use restriction on nonresponsive data obtained pursuant to a warrant, i.e., government agents would be limited in what could be used based on what was actually described by the warrant.[61]

### b. Reasonableness

[24] But under the circumstances present here, we need not define the precise contours of the plain view doctrine with respect to electronic data on a cell phone. The ultimate touchstone of the Fourth Amendment is reasonableness.[62]

Here, the initial search warrant authorized an examination of the phone for evidence relating to offenses of unlawful intrusion. Unlawful intrusion includes intruding upon another in a place of solitude or seclusion; it also encompasses photographing or filming the intimate area of another without his or her knowledge and consent.[63]

Given the offense identified, it was reasonable to search files containing images and to view videos to determine

---

[58] Clancy, *supra* note 8 at 818.

[59] *Id.* at 37.

[60] See *State v. Bock, supra* note 57.

[61] See Orin S. Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech L. Rev. 1 (2015).

[62] See *Riley v. California, supra* note 5.

[63] See Neb. Rev. Stat. § 28-311.08 (Reissue 2016 & Cum. Supp. 2020).

whether they were responsive to the warrant. In doing so, law enforcement observed images showing a woman in a state of undress. Such images could be consistent with the crime and fall within the scope set forth on the face of the initial warrant. Further, the viewing of videos was a reasonable search within the scope of the warrant's authorization because discovery of the sexual assault—which was intertwined with filming the intimate area of another—occurred while the officer was searching for evidence of unlawful intrusion.

The evidence viewed was consistent with the crime identified in the search warrant. Here, the evidence uncovered fell within the scope of the search authorized by the warrant.

### (iii) Independent Source

Finally, McGovern asserts that the independent source doctrine did not support the second warrant. The State argues otherwise.

[25] Under the independent source doctrine, the challenged evidence is admissible if it came from a lawful source independent of the illegal conduct.[64] The U.S. Supreme Court explained the doctrine's rationale:

> "'[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'"[65]

---

[64] *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

[65] *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), quoting *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

To establish that the independent source doctrine applies to evidence seized pursuant to a warrant obtained after an unlawful entry to a home, the government must show both (1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant.[66]

But the doctrine presupposes illegal police conduct.[67] And here, the State argues that "all of that evidence was properly viewed and thereafter seized; the videos pursuant to the plain view doctrine, and the incriminating search history pursuant to the first search warrant."[68] Above, we concluded that the viewing of the videos and photographs was reasonable and the evidence was within the scope of the first warrant. Thus, no illegal police conduct occurred and we need not rely upon the independent source doctrine.

Because the evidence of the sexual assault was properly viewed and provided support for the March 2020 search warrant, the court did not err in overruling McGovern's second motion to suppress evidence derived from the searches of his phone. We find no merit to McGovern's cross-appeal.

## 2. Sentencing

Turning to the State's appeal, it argues that the district court imposed an excessively lenient sentence. The court convicted McGovern of three crimes and imposed sentences within statutory limits. For the Class I misdemeanor[69]—punishable by a maximum of 1 year's imprisonment, $1,000 fine, or both[70]—the court imposed a sentence of 1 year's

---

[66] *U.S. v. Khabeer*, 410 F.3d 477 (8th Cir. 2005).

[67] See *Murray v. United States, supra* note 65.

[68] Brief for appellant on cross-appeal at 21.

[69] See Neb. Rev. Stat. § 28-320(3) (Reissue 2016).

[70] See Neb. Rev. Stat. § 28-106(1) (Reissue 2016).

imprisonment. For the Class IV felony[71]—punishable by a maximum of 2 years' imprisonment and 12 months' post-release supervision, $10,000, or both[72]—the court imposed a sentence of 1 year's imprisonment. It ordered the sentences for those two offenses to run concurrently. Then, for the Class II felony[73]—punishable by 1 to 50 years' imprisonment,[74] but with no mandatory minimum—the court imposed a sentence of probation. It is this sentence of probation that is the focus of the State's challenge.

Before turning to sentencing factors, we address two arguments made by the State. One concerns what the State views as an incongruity in the felony sentences imposed. The other is whether the sentences here must be viewed individually or may be viewed collectively.

(a) Alleged Incongruity

The State highlights that for the court to have imposed imprisonment for the Class IV felony conviction, it had to have concluded that there were "substantial and compelling reasons"[75] to not impose probation. According to the State, it follows that those same reasons would also exist for the Class II felony.

A statute mandates that a sentence of probation be imposed for a Class IV felony unless a delineated exception applies.[76] The exceptions are: (a) the defendant is sentenced to imprisonment for any felony other than another Class IV felony, (b) the defendant has been deemed a habitual criminal, or (c) there are substantial and compelling reasons why the defendant

---

[71] See § 28-311.08(2).

[72] See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2020).

[73] See Neb. Rev. Stat. § 28-319(2) (Reissue 2016).

[74] See § 28-105(1).

[75] Neb. Rev. Stat. § 29-2204.02(2)(c) (Reissue 2016).

[76] See *id.*

cannot be effectively and safely supervised in the community.[77] The last exception is the only one having potential application here.

Section 29-2204.02 was a new statute created by 2015 Neb. Laws, L.B. 605.[78] That comprehensive bill was "designed to slow Nebraska's prison population growth, ease prison overcrowding, contain corrections spending, and reinvest a portion of savings in strategies that can reduce recidivism and increase public safety."[79] The policies in the bill addressed three major challenges, one being that "overcrowded prisons house a large number of people convicted of nonviolent, low-level offenses."[80] To address such a challenge, the legislation employed a strategy to use probation for people convicted of low-level offenses.[81] Thus, § 29-2204.02 encompasses a policy decision by the Legislature favoring probationary sentences for Class IV felonies.

We have stated that "§ 29-2204.02(2) effectively adds a general limitation on a court's discretion in choosing between probation and incarceration with respect to a Class IV felony, because it requires a court to impose a sentence of probation for a Class IV felony unless certain specified exceptions are present."[82] In light of the legislative intent behind § 29-2204.02, we cannot say that findings required under this statute apply to sentencing decisions pertaining to higher-level offenses. As recognized in a concurrence, "[T]he determination with regard to a Class IV felony under

---

[77] See *id.*

[78] See *State v. Benavides*, 294 Neb. 902, 884 N.W.2d 923 (2016).

[79] Introducer's Statement of Intent, L.B. 605, Judiciary Committee, 104th Leg., 1st Sess. (Feb. 20, 2015).

[80] *Id.*

[81] *Id.*

[82] *State v. Baxter*, 295 Neb. 496, 504, 888 N.W.2d 726, 733 (2017).

§ 29-2204.02(2)(c) is different from the determination with respect to any other class of offense under § 29-2260."[83]

### (b) Individual Sentence Versus Aggregate of Sentences

The State also questions whether it is permissible to look at sentences collectively in determining whether the sentencing court abused its discretion. The State points out that in the context of the Eighth Amendment, we have determined the proportionality analysis focuses on individual sentences rather than the aggregate of sentences ordered to be served consecutively to one another.[84]

But this appeal does not involve an Eighth Amendment claim. And, similar to another recent appeal, the State has not pointed to authority requiring "any legal inquiry pertinent to review of a defendant's sentence, which analyzes proportionality vis-a-vis different sentences for different crimes imposed for the same defendant and arising from the same series of events."[85]

When a judge is imposing sentences for several convictions at the same time, we see no reason why a sentencing judge should be prohibited from considering the cumulative effect of the sentences. "[F]or a defendant who has been sentenced consecutively for two or more crimes, we generally consider the aggregate sentence to determine if it is excessive."[86] We see no reason why the same rule should not apply when considering whether a sentence is excessively lenient. A trial judge is invested with a wide discretion as to the sources and types of information used to assist with the determination of

---

[83] *State v. Dyer*, 298 Neb. 82, 95, 902 N.W.2d 687, 696 (2017) (Miller-Lerman, J., concurring).

[84] See *State v. Becker*, 304 Neb. 693, 936 N.W.2d 505 (2019).

[85] *State v. Morton*, 310 Neb. 355, 369-70, 966 N.W.2d 57, 68 (2021).

[86] *Id.* at 370, 966 N.W.2d at 68.

a sentence to be imposed within statutory limits.[87] The collective effect of multiple sentences may be a source of information. If each sentence imposed is within the statutory limit, a sentencing judge need not view those sentences in isolation in determining whether the overall sentence it crafts achieves the sentencing goals of rehabilitating the defendant, deterring others from criminal acts, and providing protection for society. We now consider the statutory sentencing factors and their application to the facts of this case.

(c) Statutory Factors

[26] In reviewing whether a sentencing court abused its discretion in imposing a sentence that was excessively lenient, an appellate court is guided by the factors set forth by Neb. Rev. Stat. § 29-2322 (Reissue 2016), as well as by the statutory guidelines set out for the direction of the sentencing judge in imposing or withholding imprisonment.[88] In determining whether the sentence imposed is excessively lenient, an appellate court shall have regard for the following:

(1) The nature and circumstances of the offense;

(2) The history and characteristics of the defendant;

(3) The need for the sentence imposed:

(a) To afford adequate deterrence to criminal conduct;

(b) To protect the public from further crimes of the defendant;

(c) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(4) Any other matters appearing in the record which the appellate court deems pertinent.[89]

---

[87] See *State v. Janis*, 207 Neb. 491, 299 N.W.2d 447 (1980).

[88] *State v. Gibson, supra* note 3.

[89] § 29-2322.

A different statute authorizes a court to impose a period of probation in lieu of incarceration. Neb. Rev. Stat. § 29-2260 (Reissue 2016) provides in part:

(2) Whenever a court considers sentence for an offender convicted of either a misdemeanor or a felony for which mandatory or mandatory minimum imprisonment is not specifically required, the court may withhold sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because:

(a) The risk is substantial that during the period of probation the offender will engage in additional criminal conduct;

(b) The offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or

(c) A lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for law.

(3) The following grounds, while not controlling the discretion of the court, shall be accorded weight in favor of withholding sentence of imprisonment:

(a) The crime neither caused nor threatened serious harm;

(b) The offender did not contemplate that his or her crime would cause or threaten serious harm;

(c) The offender acted under strong provocation;

(d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;

(e) The victim of the crime induced or facilitated commission of the crime;

(f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;

(g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;

(h) The crime was the result of circumstances unlikely to recur;

(i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

(j) The offender is likely to respond affirmatively to probationary treatment; and

(k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

(4) When an offender who has been convicted of a crime is not sentenced to imprisonment, the court may sentence him or her to probation.

### (d) Application

McGovern committed the serious crime of sexual assault in the first degree. The offense involved sexual contact—preserved on video—at a time when K.S. was incapable of giving consent. At sentencing, McGovern's counsel highlighted that "this is essentially a touching kind of offense . . . we're not talking about intercourse." But that does not diminish McGovern's violation of trust. According to K.S.' statement, McGovern sexually assaulted her on video on the day she was first introduced to him. They later had a dating relationship for a period of time, and she did not learn of the assaults until after she had ended the relationship. K.S. stated that she has to "live with the embarrassment of the knowledge that at a minimum, numerous law enforcement and criminal justice officials from multiple jurisdictions have seen the videos of [her] sexual assaults, have seen [her] in states of undress."

[27] Evidence regarding a defendant's life, character, and previous conduct, as well as prior convictions, is highly relevant to the determination of a proper sentence.[90] According

---

[90] *State v. Gibson, supra* note 3.

to the presentence report, McGovern was 39 years old. His prior criminal history included three convictions for driving under the influence between 2001 and 2007 and a conviction for attempted unlawful intrusion based on the September 2018 event that led to discovery of the instant offenses. At the time of sentencing, McGovern was facing charges in Montana for alleged conduct similar to that in the instant case. A testing tool assessed him to be at a "[m]edium-[h]igh" risk to reoffend. He scored in the "maximum risk range on the SAQ alcohol scale." According to the presentence report, McGovern was "highly motivated and engaged in counseling." The report also stated that he "seems to show some remorse for the victim."

[28] A sentencing court must have some reasonable factual basis for imposing a particular sentence.[91] The court expressed difficulty in balancing the need for rehabilitation against the need for punishment. The court explained:

> On the one hand, there's an absolute violation of trust, and in reviewing the evidence in this case which I had to do on several occasions, you were taking advantage of someone who was absolutely out of it and it appears to be a part of a pattern of conduct not entirely dissimilar from the incident in Kearney, Nebraska, which led to your convictions here ultimately.
>
> On the other hand, I am required by law to consider rehabilitation. I am required to consider the fact that you have done a good job apparently while on probation.

In imposing the three sentences, the court stated they were an "attempt to reach a balance in this case" and that they were "necessary not to depreciate the serious nature of your criminal conduct in your eyes or the eyes of the public." The court then imposed concurrent sentences of 1 year's imprisonment for two offenses and for the other offense, a period of Community-Based Intervention probation for 60 months.

---

[91] *State v. Parminter*, 283 Neb. 754, 811 N.W.2d 694 (2012).

In connection with the sentence of probation, the court levied numerous terms. Obviously, McGovern cannot violate any laws while on probation. He must also refrain from disorderly conduct or acts injurious to others. He cannot associate with persons of "disreputable or harmful character" or persons he knows are involved in illegal activities. He must be gainfully employed or actively seeking employment. The terms of probation affect McGovern's liberty. He must allow the probation officer to visit at all reasonable times and places. He cannot leave the state without written authorization of the court or the probation officer. McGovern cannot possess a firearm or dangerous weapon. He must submit to a chemical test of his blood, breath, or urine upon request of the probation officer. The court further determined that a period of confinement was necessary and ordered McGovern to serve 90 days in jail, which sentence was to be served consecutively to any other sentence imposed.

As McGovern notes, the court could have placed him on probation for all three convictions. Had it done so, the court would have been limited to a maximum period of incarceration of 90 days as a condition of probation.[92] Instead, the court imposed a sentence of 1 year's imprisonment for the lesser offenses—the maximum sentence for the misdemeanor conviction—and a 90-day period of confinement as a condition of probation in addition to placing McGovern on probation for the maximum period of time allowed.[93] The court attempted to balance the needs for punishment and rehabilitation.

Our review for an abuse of discretion is key. The standard is not what sentence we would have imposed.[94] And as we recognized 20 years ago, "'it is a rare exception'" that a

---

[92] Neb. Rev. Stat. § 29-2262(2)(b) (Cum. Supp. 2020).

[93] See Neb. Rev. Stat. § 29-2263(1) (Reissue 2016).

[94] *State v. Gibson, supra* note 3.

sentence within statutory limits will be deemed excessive.[95] Because the same standard applies to determining whether a sentence is excessively lenient, the same observation applies here. These sentences do not fall within that category. We cannot say the sentences imposed, particularly when viewed collectively, amounted to an abuse of discretion.

## IV. CONCLUSION

Because law enforcement reasonably observed the evidence of sexual assault during execution of the initial search warrant, the court did not err in overruling McGovern's second motion to suppress evidence derived from the searches of his phone. We further conclude that the sentences imposed, all within the statutory limits, were not excessively lenient. We emphasize that the sentences must be viewed collectively and that we are not permitted to substitute the sentences we might have imposed as a sentencing court. Accordingly, we affirm the judgment of the district court.

Affirmed.

---

[95] *State v. Decker*, 261 Neb. 382, 398, 622 N.W.2d 903, 917 (2001).

Miller-Lerman, J., concurring.

I concur. In this case, the opinion evidence from both experts taken as a whole essentially states that, given the technology, it is not possible to review the contents of the cell phone to merely determine the existence of a photograph or video on September 25, 2018, without also looking to some extent at the image. This may seem surprising. Nevertheless, the district court accepted the opinions. These opinions circumscribed the district court's analysis and that of this court upon review. See *Tipp-It, Inc. v. Conboy*, 257 Neb. 219, 234, 596 N.W.2d 304, 315 (1999) (Gerrard, J., concurring) (when appellate court review is guided by expert testimony, review is confined to record before it and "[i]t is not the proper role of an appellate court to become a 'super expert,' randomly

imposing its opinion over those opinions properly admitted in evidence"). Given the limitation imposed by the evidence, I cannot disagree with the court's analysis. That leaves for another day a serious Fourth Amendment examination of the hazards of rummaging through digital devices, the making and retention of full forensic copies (or mirrors), the use of data nonresponsive to the warrant, and the constitutional limitations on second warrants as a cure.