Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/23/2024 09:11 AM CDT

State of Nebraska, appellee, v.
Kay E. Anderson, appellant.
___ N.W.3d ___

Filed August 23, 2024.    No. S-22-846.

1. **Convictions: Appeal and Error.** In an appeal of a criminal conviction, an appellate court reviews the evidence in a light most favorable to the prosecution.

2. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

3. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

4. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. When deciding appeals from criminal convictions in county court, the Nebraska Court of Appeals and Nebraska Supreme Court apply the same standards of review that are applied to decide appeals from criminal convictions in district court.

5. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh

the evidence presented, which are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

6. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

7. **Search Warrants: Affidavits: Probable Cause.** A warrant authorizing a search must be based on probable cause as established in an affidavit and application in support of the warrant.

8. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched.

9. **Search Warrants: Affidavits: Probable Cause: Police Officers and Sheriffs: Presumptions: Proof.** There is a presumption of validity with respect to affidavits supporting applications for search warrants, but that presumption may be overcome, and a search warrant may be invalidated, if the defendant proves the affiant officer knowingly and intentionally, or with reckless disregard for the truth, included in the affidavit false or misleading statements that were material to establishing probable cause. Courts extend the same rationale to misleading omissions of material information from warrant affidavits.

10. **Search Warrants: Affidavits: Probable Cause.** Omissions in an affidavit used to obtain a search warrant are considered misleading when the omitted information tends to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit.

11. **Search Warrants: Affidavits: Probable Cause: Police Officers and Sheriffs: Evidence: Proof.** If the defendant proves, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement or omitted information material to a probable cause finding, then the court examines whether the evidence obtained from the warrant and search was fruit of the poisonous tree. To do this, the court reexamines the affidavit after deleting the false or misleading statement and including the omitted information, and it determines whether, viewed under the totality of the circumstances, it still establishes probable cause. If this reexamination shows that the affidavit does not establish probable cause, then the search warrant is deemed void and the fruits of the search are excluded.

12. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** An appellate court reviews for clear error the trial court's findings as to whether the affidavit supporting the warrant contained falsehoods or omissions and whether those were made intentionally or with reckless disregard for the truth. However, an appellate court reviews de novo the determination that any alleged falsehoods or omissions were not necessary to the probable cause finding.

13. **Administrative Law: Constitutional Law: Search Warrants.** Administrative inspections of residential buildings to ascertain compliance with health and safety codes are significant intrusions upon the interests protected by the Fourth Amendment, and residents who do not consent to such an inspection have a constitutional right to insist that the inspectors obtain a warrant, absent exigent circumstances.

14. **Administrative Law: Criminal Law: Probable Cause: Search Warrants.** The probable cause necessary to support issuance of an administrative inspection warrant is clearly different from the probable cause necessary to support issuance of a criminal search warrant.

15. **Administrative Law: Probable Cause: Search Warrants.** Probable cause to issue an inspection warrant exists if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular building.

16. ____: ____: ____. Probable cause to issue an administrative inspection warrant does not require a showing that a particular dwelling contains violations of the minimum standards proscribed by the code being enforced.

17. **Administrative Law: Public Policy: Probable Cause: Search Warrants.** The administrative inspection warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted inspection warrant.

18. **Administrative Law: Probable Cause: Search Warrants: Evidence.** Probable cause to justify issuance of an administrative inspection warrant can be based either on a showing of specific evidence of an existing violation or on a more general showing that reasonable legislative or administrative standards for conducting an area inspection have been satisfied.

19. **Administrative Law: Constitutional Law: Public Policy: Probable Cause: Search Warrants.** Although there may be sound public policy reasons for requiring inspectors to show that consent to inspect was refused before seeking an administrative inspection warrant, such a

prerequisite is neither compelled by the Fourth Amendment nor necessary to establish probable cause.

20. **Constitutional Law: Search and Seizure: States.** Not every violation of a state law restricting searches is sufficient to show a Fourth Amendment violation.

21. **Constitutional Law: Statutes: Evidence.** Absent a constitutional violation, a court will normally suppress evidence obtained in violation of a rule or statute only if the governing law provides that remedy.

22. **Constitutional Law: Statutes: Search and Seizure: Evidence.** In the absence of a constitutional violation, the failure to comply with the ministerial step of seeking consent to inspect under Neb. Rev. Stat. § 29-832 (Reissue 2016) before seeking issuance of an inspection warrant is a technical irregularity that, absent a statute providing otherwise, does not require suppression.

23. **Judgments: Appeal and Error.** A correct result will not be set aside merely because the wrong reasoning was applied.

24. **Ordinances: Statutes: Appeal and Error.** When analyzing a municipal ordinance, Nebraska courts apply the same rules of construction as those applied to statutory analysis.

25. **Criminal Law: Statutes.** A penal statute is to be given a sensible construction in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.

26. **Ordinances: Courts.** When interpreting an ordinance, a court's analysis begins with the text. When the words are plain, direct, and unambiguous, courts are to give the language its plain and ordinary meaning.

27. ____: ____. It is not within the province of the courts to read meaning into an ordinance that is not there or to read anything direct and plain out of an ordinance.

Appeal from the District Court for Douglas County, Leigh Ann Retelsdorf, Judge, on appeal thereto from the County Court for Douglas County, Grant A. Forsberg, Judge. Judgment of District Court affirmed.

Jason M. Bruno, Robert S. Sherrets, and James L. Schneider, of Sherrets, Bruno & Vogt, L.L.C., for appellant.

Kevin J. Slimp, Omaha City Prosecutor, and Lindsey L. Bitzes for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

After a bench trial in county court, Kay E. Anderson was found guilty of several misdemeanor violations of a city property maintenance code and was sentenced to probation. He appealed his convictions to the district court, which affirmed. Anderson appeals again, arguing that evidence of the code violations should have been suppressed because it was discovered while executing an invalid inspection warrant. He also argues the evidence at trial was insufficient to support his convictions.

We moved this matter to our docket primarily to address the validity of the inspection warrant, which presents an issue of first impression. Although our reasoning differs in some respects from that applied below, we affirm.

## I. BACKGROUND

### 1. Apartment Complex

This appeal involves the prosecution of multiple municipal code violations discovered at a residential apartment complex in Omaha, Nebraska. The complex, commonly referred to as "Yale Park," consists of 13 buildings with approximately 100 residential units and several hundred tenants. At all relevant times, the record owner of Yale Park was "AB Realty, LLC." AB Realty's articles of incorporation list Anderson as its registered agent, manager, and organizer and as one of two members.

At trial, Anderson's wife testified that she was the sole member of AB Realty and that Anderson had been removed as a member for "estate planning" purposes but was still the manager. In September and October 2018, Anderson and his wife were also residents of Yale Park, living in apartment No. 24. Many of the other tenants of Yale Park are described in the record as refugees.

On August 31, 2018, Omaha's chief housing inspector, accompanied by others, including a refugee coordinator from a local nonprofit organization, met with Anderson in the office area of one of the Yale Park buildings. The purpose of the meeting was to address concerns about unsafe living conditions and poor building maintenance at Yale Park. During that meeting, Anderson indicated that "he owned the apartment," and when the refugee coordinator shared specific maintenance requests from tenants that had not been addressed, Anderson replied that he "personally was being a little bit lackadaisical about the maintenance requests" but that "he would do a better job." Anderson also commented that the living conditions at Yale Park still provided more opportunity for the refugee tenants than they had in their countries of origin.

## 2. Inspection Warrant

A few weeks later, on September 18, 2018, Omaha's chief housing inspector applied for an inspection warrant for Yale Park. Because Anderson's appeal challenges the validity of the inspection warrant, we summarize the statutory requirements governing such warrants in Nebraska before discussing the facts surrounding the application, issuance, and execution of the inspection warrant at issue in this case. We examine the constitutional requirements for inspection warrants later in the opinion.

### (a) Statutory Requirements for Inspection Warrants

In 1969, the Nebraska Legislature enacted a series of statutes governing the issuance of administrative inspection warrants[1] in response to the U.S. Supreme Court's decision in *Camara v. Municipal Court.*[2] That case announced the new rule that

---

[1] See Neb. Rev. Stat. §§ 29-830 to 29-835 (Reissue 2016).

[2] *Camara v. Municipal Court*, 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). Accord *See v. City of Seattle*, 387 U.S. 541, 87 S. Ct. 1737, 18 L. Ed. 2d 943 (1967) (holding that rule announced in *Camara* also applies to inspections of commercial property).

inspections of residential buildings for compliance with health and safety codes must be conducted pursuant to an inspection warrant, absent consent or exigent circumstances. The stated purpose of Nebraska's statutory scheme was "to provide a procedure which will meet the requirements laid down by the Supreme Court"[3] in *Camara*.

Section 29-830 defines an inspection warrant as "an order in writing in the name of the people, signed by a judge of a court of record, directed to a peace officer . . . and commanding him to conduct any inspection required or authorized by state or local law or regulation relating to health, welfare, fire or safety." Section 29-833 provides that inspection warrants "shall be issued only by a judge of a court of record upon reasonable cause, supported by affidavit describing the place and purpose of inspection." And § 29-832 states, "Inspection warrants *shall be issued only upon showing that consent to entry for inspection purposes has been refused.* In emergency situations neither consent nor a warrant shall be required." (Emphasis supplied.) Anderson's challenge to the validity of the inspection warrant is based exclusively on the emphasized language above, which we will refer to as the "prior refusal" provision of § 29-832.

### (b) Inspection Warrant for Yale Park

On September 19, 2018, the chief housing inspector applied for an inspection warrant for Yale Park. His affidavit in support stated that on September 14, he received "code violation complaints detailing major health and safety violations on 84 out of the 100 units" at Yale Park. The affiant further stated that he attended various community meetings in June, July, and August 2018 at which he "learned that the [r]efugees . . . at Yale Park are living in conditions that are not safe and [are] unhealthy and that the owner of the property is not responsive to the repairs and needs of the residents."

---

[3] Introducer's Statement of Purpose, L.B. 703, Judiciary Committee, 80th Leg., 1st Sess. (Mar. 3, 1969).

The affidavit stated that several refugee advocacy groups had obtained permission from the tenants at Yale Park to conduct informal inspections "of most of the 100 units." The purpose of such inspections was to identify possible health and safety code violations and to educate the tenants on "how to file proper complaints." According to the affidavit, "hundreds of code violations" were observed inside tenant units, including holes in ceilings and roofs; gas leaks; inoperable appliances; broken furnaces and air conditioners; broken windows and doors; water leaks and plumbing problems, including no running water; "electrical panels being used as light switches for entire apartment units"; and various health issues, including "rodents, bed bugs, roaches, maggots [and] mold." The affidavit also stated that in recent weeks, the Omaha metropolitan utilities district had to shut off the natural gas to four separate units at Yale Park due to gas leaks.

The chief housing inspector averred that he and others had met personally with the "owner, . . . Anderson," to discuss living conditions at Yale Park and recounted that in that meeting, Anderson admitted he had been "very lackadaisical" in completing tenant work orders. Anderson also told inspectors he "gives the Refugees a better way of living than they are used to" and he "keeps his rent low and has a waiting list of potential tenants so he does not care if tenants leave." The affidavit stated that due to the severity and number of potential code violations reported by tenants, the chief housing inspector was requesting a search warrant for all 100 units at Yale Park. The affidavit concluded by stating, "The complaints received[,] if found to be accurate and real, are worthy of immediate vacate orders" to remove tenants from the buildings until "the entire structure is repaired" up to standard under the Omaha Municipal Code (OMC).

Later the same day, a county court judge issued an inspection warrant for all areas of Yale Park. The warrant included an express finding that, based on the supporting affidavit, there was reasonable cause to believe that Yale Park was "being

occupied in violation of [OMC] sections dealing with property maintenance [and] building and other structural codes," that the owner had "failed to comply with" the OMC, and that the property posed "a public health hazard." The warrant also stated "the City of Omaha has been unable to obtain consent from the owner's representative, . . . Anderson, to enter the grounds . . . for inspection purposes," although no averments to that effect were contained in the supporting affidavit. The warrant authorized peace officers to enter all areas of Yale Park, during daytime hours, to conduct any inspection authorized or required by state or local law or regulation relating to health, welfare, fire, or safety and included authority to "breach locked doors or gates if necessary" and to photograph or videotape evidence of violations found.

On September 20, 2018, seven Omaha housing inspectors executed the inspection warrant at Yale Park. Inspectors discovered approximately 2,500 separate violations of the OMC, and the violations were documented and photographed. Due to conditions observed during the inspection, including a bedbug infestation, all Yale Park residents were immediately removed from the complex and relocated pending repairs. Anderson, however, was allowed to be on the Yale Park property daily from 7 a.m. to 5 p.m. to complete necessary repairs.

### (c) Notice of Violations and Correction Order

As a result of the code violations discovered at Yale Park, housing inspectors issued a series of written violation notices and correction orders. Because Anderson challenges the sufficiency of the evidence regarding those notices and orders, we set out the relevant OMC provisions before summarizing the evidence.

### (i) Notice Requirements Under OMC

Omaha Mun. Code, ch. 48, art. I, § 48-61 (2003), provides, "Whenever the code official determines that there has been a violation of [the OMC] or has grounds to believe that a

violation has occurred, notice shall be given to the owner or the person or persons responsible therefore [sic]." Omaha Mun. Code, ch. 48, art. I, § 48-12(a) (2003), provides that "the owner or the owner's designated agent shall be responsible for the maintenance of buildings, structures and premises."

Omaha Mun. Code, ch. 48, art. I, § 48-63 (2003), sets out the authorized methods for serving violation notices to the owner or persons responsible and provides that "[s]uch notice shall be deemed to be properly served if a copy thereof is: (1) Delivered personally [or] (2) Sent by certified or first-class mail addressed to the last-known address[.]" If a notice is returned as not delivered, OMC § 48-63 allows it to be served by posting a copy "in a conspicuous place in or about the structure affected by such notice."

Omaha Mun. Code, ch. 48, art. I, § 48-62 (2015), governs the form and content of the required notice and, as relevant here, requires that a violation notice

(1) Be in writing.

(2) Include a description of the real estate sufficient for identification.

(3) Include a specific statement of all violations presently known, including the code sections violated.

(4) Include a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the provisions of [the OMC].

OMC § 48-62 further provides that "[o]rdinarily," a reasonable period of time to make repairs "shall be the periods prescribed in Table 48-62(4)" of the OMC, but that "such time can be increased or decreased if reasonable in light of the health or safety concerns presented by the violation." The violations at issue on appeal all involved "mechanical, plumbing, or electrical" issues as categorized in the table in OMC § 48-62(4), which provides that the initial notice for such violations should allow 30 days for repair; it also authorizes inspectors to grant a total of two additional 30-day extensions.

#### (ii) Notices Issued for Yale Park

Between September 26 and October 9, 2018, Omaha housing inspectors issued multiple written violation notices that, collectively, described approximately 2,000 code violations at Yale Park. Each notice described the violations within a single building, and all notices were sent via first-class mail to "AB REALTY LLC[,] 2400 N 34 AVE #24[,] OMAHA, NE 68111." It is undisputed that this mailing address was the apartment at Yale Park where Anderson and his wife had last resided. None of the notices were returned as undelivered, and at trial, Anderson's wife admitted the violation notices were received.

Each violation notice included a description of the property and a specific statement of the alleged code violations, including the OMC sections that applied. For simplicity, we will refer to these as the "underlying code violations." As relevant to the issues on appeal, the violation notices included correction orders directing that the listed violations must be abated no later than 30 days from the date of the notice, and further directing that the property must be maintained "in compliance with the [OMC]." The notices also stated, "Any person directly affected by this notice may file an appeal with the Property Maintenance Appeals Board" and set out the procedure for doing so. The record shows that Anderson filed an administrative appeal of the violation notices, and the appeals board eventually allowed him additional time to remedy the underlying code violations at Yale Park. However, the OMC provides that an administrative appeal to Omaha's property maintenance appeals board "shall not stay the criminal prosecution of any violation of any section of [the OMC]."[4]

#### 3. Followup Inspections and Notices

After the expiration of the 30-day abatement period set out in the first set of correction orders, an Omaha housing

---

[4] Omaha Mun. Code, ch. 48, art. I, § 48-102 (2008).

inspector conducted a followup inspection at Yale Park. The housing inspector spoke with Anderson, who told the inspector that "no repairs had been made yet."

Housing inspectors then issued a second set of violation notices with correction orders dated between October 30 and November 30, 2018. Those notices were also sent via first-class mail addressed to "AB REALTY LLC" at Anderson's last-known address at Yale Park. The second set of correction orders provided an additional 30 days to abate the underlying code violations identified in the original notices.

After the second 30-day abatement period expired, an inspector conducted another followup inspection at Yale Park, which again showed that none of the required repairs had been started. Housing inspectors then issued a third set of violation notices with correction orders, dated December 17, 2018, through January 2, 2019, and again sent them via first-class mail addressed to "AB REALTY LLC" at the same Yale Park address. The third set of correction orders provided an additional 30 days to abate the underlying code violations identified in the original notices. Additionally, letters were sent that stated in part:

> During the next reinspection, if progress is seen and work is completed in a timely and workmanlike manner, citations may not be issued and an extension to abate the remaining violations may be granted. However, if progress is not made to abate the remaining violations, criminal citations will be issued.

Pursuant to the relevant extensions granted in the second and third set of correction orders, the latest date for abating the underlying code violations at Yale Park was February 2, 2019. On February 27, an Omaha housing inspector, accompanied by Anderson, inspected the interior and exterior of one of the Yale Park buildings. Anderson told the inspector it was "the building he had started repairs on." At trial, this inspector testified that while inspecting the building, he observed and photographed underlying code violations that were (1)

first discovered and documented when executing the inspection warrant approximately 5 months earlier, (2) identified in all the violation notices and correction orders, and (3) still uncorrected.

### 4. Misdemeanor Criminal Charges

On March 1, 2019, the State filed a criminal complaint in the county court for Douglas County charging Anderson with 99 counts of violating Omaha Mun. Code, ch. 48, art. I, § 48-53 (2015). Each of the counts corresponded to a different residential unit in Yale Park. Anderson was ultimately convicted of just 4 of the 99 counts, and this opinion generally recounts the evidence relating to only those 4 convictions.

OMC § 48-53 is titled "Prosecution of violation," and it provides in part:

> Any person who knowingly fails to comply with a section of [the OMC] or with a notice of violation or order served in accordance with [the OMC] for a period of at least 90 days after such service shall be deemed guilty of a misdemeanor and be punished as provided in section 1-10 of [the OMC].

Under Omaha Mun. Code, ch. 1, § 1-10 (1980), misdemeanor code violations are punishable by a fine not to exceed $500, imprisonment not to exceed 6 months, or both such fine and imprisonment. The complaint alleged that Anderson violated OMC § 48-53 by unlawfully failing to comply with a section of Omaha's property maintenance code or by failing to comply with a notice of violation or order served in accordance with that code.[5] The complaint was later amended to include

---

[5] See, generally, Neb. Rev. Stat. § 14-415 (Reissue 2022) (authorizing cities of metropolitan class to institute any appropriate action to prevent unlawful maintenance or use of building or structure in violation of municipal ordinance, and making it misdemeanor for any owner, general agent, lessee, tenant, architect, builder, contractor, or "any other person" to assist in such violation or to "maintain[] any building or premises in which any such violation shall exist").

updated references to the applicable OMC sections corresponding to the underlying code violations. Anderson entered not guilty pleas to all 99 counts.

Thereafter, Anderson moved several times to withdraw his not guilty pleas so he could file a motion to quash challenging, among other things, the constitutionality of OMC § 48-53. The county court denied Anderson's requests to withdraw his pleas. Because he does not assign error to those rulings on appeal before this court, we do not address them further.

### 5. Motions to Suppress

Anderson filed two successive motions to suppress evidence of the underlying code violations discovered while executing the inspection warrant in this case. His motions did not assert there was insufficient probable cause to issue the warrant; instead, Anderson asserted the inspection warrant was invalid because officials had not complied with the statutory prerequisite in § 29-832 that such warrants "shall be issued only upon showing that consent to entry for inspection purposes has been refused." The court held evidentiary hearings on both suppression motions. Anderson challenges both rulings on appeal, and we address them in chronological order.

### (a) First Motion to Suppress

Anderson's first motion to suppress asserted the inspection warrant was invalid because the affidavit "misled [the] Court into believing that consent was requested and refused" when, in reality, "the conditions precedent to issuance required by . . . § 29-832" had not been satisfied. The motion asserted that the failure to comply with the prior refusal provision in § 29-832 rendered the inspection warrant "unlawful, unauthorized, unconstitutional, and void" and required suppression of all evidence discovered as a result of execution of the warrant.

At the suppression hearing, the chief housing inspector testified and copies of the inspection warrant and supporting affidavit were received. In response to questioning by the State, the housing inspector generally testified to the veracity of the factual allegations contained in his affidavit and application for inspection warrant. He also testified that before applying for the warrant, he had been shown photographs taken by refugee advocates who had been allowed inside the tenants' apartments at Yale Park, and he believed the photographs were consistent with the numerous written code violation complaints he received and referenced in his affidavit.

On cross-examination, the inspector admitted that before applying for the inspection warrant, he had neither personally asked any of the Yale Park tenants for consent to inspect their apartments nor asked Anderson "or anybody at AB Realty" for consent to inspect. The housing inspector explained that when he drafted the proposed inspection warrant that was submitted to and signed by the judge, he used a template with boilerplate language about refusal of consent.

Based on this evidence, Anderson argued that the inspection warrant was constitutionally invalid and that suppression was the appropriate remedy because the chief housing inspector's affidavit "misled" the court into believing that consent was requested and refused when it was not. In response, the State argued the housing inspector had not deliberately misled the court about refusal of consent, emphasizing "there was no misstatement in the affidavit itself, only an unintended error in the boilerplate language" used to draft the proposed warrant. The State also argued that even though consent had not been requested or refused, the constitutional validity of the inspection warrant turned on whether it was supported by probable cause. And because the inspection warrant was supported by probable cause, the State argued, suppression was not an appropriate remedy. Additionally, the State argued that the good faith exception applied and that Anderson lacked standing to challenge the validity of the inspection warrant,

because he had no reasonable expectation of privacy in residential units leased to others.

In a written order, the county court granted Anderson's motion to suppress. It found he had standing to challenge the validity of the inspection warrant because he was "a property owner of a multi-residential unit complex" and was actively managing and maintaining the complex and living in one of the units. The court expressed uncertainty about whether the language of § 29-832 required refusal of consent by all the individual tenants at Yale Park or by just Anderson, but concluded it was not necessary to decide that issue because the evidence showed that no one had been asked for, or refused, consent to inspect. Based on the failure to show any prior refusal under § 29-832, the court determined the inspection warrant was "invalid." It declined to apply the good faith exception to the exclusionary rule and suppressed "all information, evidence, photos, notes, and the like" obtained during execution of the inspection warrant.

### (b) Interlocutory Appeal of First Suppression Ruling

The State was granted leave to seek immediate review of the suppression order in the district court.[6] In that interlocutory appeal, the State did not contest the county court's determination that noncompliance with the prior refusal provision in § 29-832 rendered the inspection warrant invalid. Instead, the State argued the county court erred in finding that Anderson had standing to challenge the validity of the inspection warrant at all, at least as it pertained to residential property leased to others.

The district court agreed with the State that Anderson did not have a reasonable expectation of privacy in residential units leased to others and, citing cases to that effect from other

---

[6] See Neb. Rev. Stat. §§ 29-824 to 29-826 (Reissue 2016).

jurisdictions,[7] reversed the suppression order as it pertained to evidence discovered in leased units. The district court affirmed the suppression of evidence discovered in the unit where Anderson and his wife resided, and it then remanded the matter back to the county court.

### (c) Second Motion to Suppress

After remand, Anderson filed what he titled a "Renewed Motion to Suppress Inspection Warrant" in the county court. Like the first motion, the renewed motion asserted the inspection warrant was rendered invalid due to noncompliance with § 29-832. The State objected to taking up suppression a second time and argued the district court's order was statutorily binding under § 29-824.[8]

Over the State's objection, the county court held an evidentiary hearing on the renewed motion to suppress. At that hearing, Anderson's wife testified that Anderson was an agent of AB Realty and the person "in charge" of managing Yale Park. She said Anderson was responsible for "repairs, inspections, [and] maintenance" for the entire apartment complex, including the leased residential units, adding: "I mean, he mows the lawns. He fixes the laundry. He repairs anything that needs repairing. He replaces windows that are broken. He

---

[7] See, e.g., *State v. Houghtaling*, 326 Conn. 330, 163 A.3d 563 (2017) (holding when owner leases property to another, owner loses expectation of privacy in property); *State v. Smith*, 656 S.W.2d 882 (Tenn. Crim. App. 1983) (holding general rule that tenant, not landlord, has expectation of privacy in leased premises, unless lessor has specifically reserved rights of possession). Accord *Camara, supra* note 2, 387 U.S. at 540 (noting that "inspectors entered the public portion of the [residential] building with the consent of the landlord, through the building's manager," and emphasizing that no one claimed manager's consent alone was sufficient to authorize inspection of leased unit).

[8] See § 29-824(2) (providing that State may appeal county court ruling on motion to suppress to district court, that "upon any trial on the general issue thereafter the parties and the trial court shall be bound by such order," and that "[u]pon conviction after trial the defendant may on appeal challenge the correctness of the order by the judge").

paints. He fixes cabinets. He fixes refrigerators. He moves the refrigerators in and out. Fixes stoves. He just does anything that's needed." Anderson's wife also testified that the lease agreements authorized Anderson to access the leased units for purposes of maintenance and inspections.

Anderson argued this evidence showed he had a reasonable expectation of privacy in the residential units leased to others and thus had standing to seek suppression of the evidence discovered in those units. The county court disagreed. In a written order, the court found the additional evidence showed only that AB Realty owned Yale Park and that Anderson was the agent responsible for maintenance at Yale Park. It concluded such evidence was not sufficient to show that Anderson had a reasonable expectation of privacy in the residential units that were owned by his principal and leased to others. Based on this reasoning, the court held that Anderson still lacked standing to contest the validity of the inspection warrant "as to the individual units."

After the suppression rulings, the State dismissed 10 counts in the operative amended complaint and the matter proceeded to trial on the remaining 89 counts.

### 6. Trial and Judgment of Conviction

In March 2021, a 5-day bench trial was held. Fifteen witnesses testified, and hundreds of exhibits were received. In addition to the evidence already described, there was evidence detailing the conditions at Yale Park, the underlying code violations observed when executing the inspection warrant, the violation notices and correction orders issued, and Anderson's response to those notices and orders. Anderson did not testify. When evidence of the underlying code violations was offered, Anderson objected and renewed his motions to suppress. The court overruled the objections.

At the conclusion of all the evidence, the State argued it had met its burden of proving beyond a reasonable doubt that Anderson knowingly violated OMC § 48-53 as alleged in all

89 counts. It pointed to evidence proving the underlying code violations at Yale Park, and it argued the evidence showed that Anderson either owned or was the person responsible for maintenance at Yale Park, that notice of all underlying code violations had been served in accordance with the OMC, and that for a period of at least 90 days after such service, Anderson knowingly failed to comply with the notices or the correction orders.

Anderson argued the State had failed to prove that he knowingly violated OMC § 48-53. He argued, among other things, that the evidence showed the violation notices were not served properly, that the violation notices were not directed to him personally, and that the correction orders did not afford him a reasonable amount of time to correct the violations. In support of the latter argument, Anderson pointed to testimony by several witnesses that they did not think all 2,000 code violations at Yale Park could be corrected in 30 days, or even in 90 or 120 days. Anderson also emphasized testimony that sometime after February 2019, Omaha's property maintenance appeals board granted his request for additional time to complete repairs of the underlying code violations at Yale Park, and that by the time of trial in 2021, all required repairs had been completed.

In a 26-page order, the county court began by identifying the material elements the State needed to prove beyond a reasonable doubt to establish a violation of OMC § 48-53. The court generally concluded that in addition to proving that Yale Park was within the Omaha city limits and thus subject to the OMC, the State had to prove, with respect to each count, that (1) the alleged code violation existed at Yale Park, (2) notice of such code violation was served in accordance with the OMC, (3) Anderson was either the owner of Yale Park or a person responsible for maintenance of the premises, and (4) Anderson knowingly failed to comply with the notice of violation or correction order for a period of at least 90 days after service.

On the first element, the court found the evidence was sufficient to prove the underlying code violations in 81 of the 89 counts. On the second element, the court found the State had proved that violation notices and correction orders were served in accordance with the OMC as to all but three counts. On the third element, the court found the State had proved that Anderson was an agent of AB Realty, was the manager of Yale Park, and was the person responsible for maintenance at Yale Park. And on the fourth element, requiring the State to prove that Anderson knowingly failed to comply with the violation notices and correction orders for a period of at least 90 days after service, the court found the State met its burden only as to counts X, XI, XV, and XVII of the amended complaint. Each of those four counts pertained to underlying code violations that the housing inspector specifically testified were still uncorrected during the reinspection on February 27, 2019, which occurred more than 90 days after the violation notices and correction orders had been served. As to all remaining counts, the court found the evidence was largely circumstantial and not sufficiently convincing to "support a finding that the State had met its burden."

The county court therefore found Anderson guilty of violating OMC § 48-53 on counts X, XI, XV, and XVII only, and not guilty on all remaining counts. The court sentenced Anderson to a 2-year term of probation, after which Anderson filed a timely appeal to the district court. The State did not cross-appeal.

## 7. District Court Appeal

On direct appeal to the district court, Anderson assigned 55 errors, including the errors he assigns on appeal to this court. In a 51-page order, the district court found no error or abuse of discretion in any of the county court's determinations and affirmed the convictions. As appropriate, we discuss some of the district court's reasoning later in our analysis.

Anderson filed this timely appeal, which we moved to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Anderson assigns, consolidated and restated, (1) that the district court erred in affirming the denial of his motions to suppress and (2) that the evidence was insufficient to support his convictions for knowingly violating OMC § 48-53, because (a) there was insufficient evidence that the violation notices and correction orders were properly served on anyone, (b) the violation notices and correction orders were not directed to Anderson personally and pertained to property he did not own, and (c) the notices and correction orders did not afford Anderson a reasonable amount of time to correct the violations.

## III. STANDARD OF REVIEW

[1] In an appeal of a criminal conviction, an appellate court reviews the evidence in a light most favorable to the prosecution.[9]

[2] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[10] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[11]

[3] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.[12]

[4] In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and

---

[9] *State v. Hammond*, 315 Neb. 362, 996 N.W.2d 270 (2023).

[10] *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020).

[11] *Id*.

[12] *Hammond, supra* note 9.

its review is limited to an examination of the record for error or abuse of discretion.[13] When deciding appeals from criminal convictions in county court, the Nebraska Court of Appeals and Nebraska Supreme Court apply the same standards of review that are applied to decide appeals from criminal convictions in district court.[14]

[5] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction.[15] In making this determination, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition.[16] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[17]

## IV. ANALYSIS

When considering Anderon's various assignments of error, we necessarily confine our analysis to the four counts of which he was convicted. We begin by addressing Anderson's assignment that the lower courts erred in overruling his motions to suppress. Because neither party raises the issue on appeal, we do not address the procedural propriety of Anderson's renewed motion to suppress, and instead, we assume without deciding that both suppression motions are properly before us.

---

[13] *State v. Buol*, 314 Neb. 976, 994 N.W.2d 98 (2023).

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] *Id*.

### 1. Motions to Suppress

Both of Anderson's suppression motions asserted that the inspection warrant was rendered constitutionally invalid and legally invalid because the inspector failed to comply with the prior refusal provision in § 29-832 and, on that basis, sought to suppress evidence of all code violations discovered in Yale Park. A defendant who seeks to suppress evidence obtained under a search warrant has the burden of establishing that the warrant is invalid so that evidence secured thereby may be suppressed.[18] We think it is appropriate to apply the same rule to a defendant who seeks to suppress evidence obtained under an inspection warrant.

Based on the evidence adduced at the suppression hearings, both the county court and the district court found that inspectors failed to ask anyone at Yale Park for consent to inspect the premises before applying for the inspection warrant and that no one had refused to give such consent. We find no clear error in this historical finding. We also understand both courts to have concluded—without specifically analyzing whose consent would have allowed inspectors to conduct a lawful warrantless inspection of Yale Park—that the failure to seek anyone's consent resulted in a violation of § 29-832. For purposes of this appeal, we likewise assume, without expressing an opinion about whose consent inspectors must seek under § 29-832, that the failure to request consent from anyone results in a violation of the prior refusal provision in § 29-832. And because the State does not argue that the affidavit's description of the conditions at Yale Park would have supported application of the "emergency situations" exception in § 29-832, we do not consider that possibility.

Both the county court and the district court appear to have also concluded that failure to comply with the prior refusal provision in § 29-832 rendered the inspection warrant

---

[18] *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004), *abrogated on other grounds, State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

constitutionally invalid, and neither party challenges that conclusion on appeal. Instead, their appellate arguments focus primarily on whether the lower courts correctly determined that Anderson lacked a reasonable expectation of privacy in the residential units leased to others and therefore lacked standing to challenge the constitutional validity of the warrant.

But whether a violation of § 29-832 renders an inspection warrant constitutionally invalid presents a question of law that an appellate court must review independently of the trial court's determination.[19] This court has not previously addressed whether the constitutional validity of an inspection warrant is affected by a violation of the prior refusal provision in § 29-832; nor have we addressed whether suppression is an appropriate remedy for such a violation.

To do so now, we begin by recalling the principles that govern the suppression of evidence when a warrant is deemed constitutionally invalid. Then we review the origins and objectives of the requirement in § 29-832 that inspection warrants "shall be issued only upon showing that consent to entry for inspection purposes has been refused" and consider whether a violation of that provision renders an inspection warrant constitutionally invalid.

### (a) Principles Governing Invalid Warrants and Suppression

[6-8] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[20] As such, it is well settled that a warrant authorizing a search must be based on probable cause as established in an affidavit and application in support of the warrant.[21] In a criminal case, probable cause sufficient to justify issuance of a search warrant means

---

[19] See *id*.

[20] *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

[21] See *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

a fair probability that contraband or evidence of a crime will be found in the item to be searched.[22]

[9] There is a presumption of validity with respect to affidavits supporting applications for search warrants, but that presumption may be overcome, and a search warrant may be invalidated, if the defendant proves the affiant officer ""knowingly and intentionally, or with reckless disregard for the truth,"" included in the affidavit false or misleading statements that were "'material'" to establishing probable cause.[23] Courts have extended the same rationale to misleading omissions of material information from warrant affidavits.[24]

[10,11] Omissions in an affidavit used to obtain a search warrant are considered misleading when the omitted information tends to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit.[25] Under these established rules, not every false statement or omission in a supporting affidavit will render a warrant constitutionally invalid. It is only when a defendant successfully proves, by a preponderance of the evidence, that the affiant "knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement or omitted information *material to a probable cause finding*"[26] that a court must go on to examine whether the evidence obtained from the warrant and search was fruit of the poisonous tree. To determine whether a false or misleading statement or omission is material to the probable cause determination, the court "reexamines the affidavit after deleting the false or misleading statement and including the omitted information, and it determines whether, viewed under the totality of the circumstances,

---

[22] *State v. McGovern*, 311 Neb. 705, 974 N.W.2d 595 (2022).

[23] *Short, supra* note 21, 310 Neb. at 125, 964 N.W.2d at 308.

[24] See *Short, supra* note 21.

[25] See *id.*

[26] *Id*. at 125, 964 N.W.2d at 308 (emphasis supplied).

it still establishes probable cause."[27] If this reexamination shows that the affidavit does not establish probable cause, then the search warrant is deemed void and the fruits of the search are excluded.[28]

[12] An appellate court reviews for clear error the trial court's findings as to whether the affidavit supporting the warrant contained falsehoods or omissions and whether those were made intentionally or with reckless disregard for the truth. However, an appellate court reviews de novo the determination that any alleged falsehoods or omissions were not necessary to the probable cause finding.[29]

Applying these principles here, we read the county court's order granting the initial motion to suppress to include a finding that, when drafting the affidavit, the chief housing inspector either intentionally, or with reckless disregard for the truth, omitted information that he had not asked anyone at Yale Park for consent to inspect before applying for the inspection warrant. Assuming without deciding that such factual finding was not clear error, we consider de novo whether the omitted information affected the court's probable cause finding.[30] To do so, we must first review the constitutional requirements for issuing inspection warrants, including the probable cause standard, as articulated by the U.S. Supreme Court.

(b) Inspection Warrants and *Camara*

In *Camara*, city housing inspectors entered an apartment building to inspect for possible housing code violations.[31] When one of the tenants refused to allow inspectors into his residence without a warrant, the tenant was cited for violating a city ordinance that made it a misdemeanor to refuse to

[27] *Id*. at 126, 964 N.W.2d at 308.

[28] *Short, supra* note 21.

[29] See *id*.

[30] See *id.*

[31] *Camara, supra* note 2.

comply with such an inspection. The tenant filed a writ of prohibition, arguing that he could not be prosecuted for failing to permit a warrantless inspection of his residence, and the writ was denied. The U.S. Supreme Court granted certiorari and reversed.

The *Camara* majority agreed with the tenant that he had "a constitutional right to insist that the inspectors obtain a warrant to search [his residence],"[32] and, to the extent *Frank v Maryland*[33] had previously authorized such inspections without a warrant, the Court overruled it. The *Camara* majority also agreed with the tenant that absent exigent circumstances, he could "not constitutionally be convicted for refusing to consent"[34] to a warrantless inspection, reasoning:

> In this case, [the tenant] has been charged with a crime for his refusal to permit housing inspectors to enter his leasehold without a warrant. There was no emergency demanding immediate access . . . [y]et no warrant was obtained and thus [the tenant] was unable to verify either the need for or the appropriate limits of the inspection. No doubt, the inspectors entered the public portion of the building with the consent of the landlord, through the building's manager, but [the city] does not contend that such consent was sufficient to authorize inspection of [the tenant's] premises.[35]

[13] *Camara* thus held that administrative inspections of residential buildings to ascertain compliance with health and

---

[32] *Id.*, 387 U.S. at 540.

[33] *Frank v. Maryland*, 359 U.S. 360, 79 S. Ct. 804, 3 L. Ed. 2d 877 (1959), *overruled in part, Camara, supra* note 2.

[34] *Camara, supra* note 2, 387 U.S. at 540.

[35] *Id.*, citing *Stoner v. California*, 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964) (warrantless search of defendant's hotel room without defendant's consent was unlawful despite consent of hotel clerk); *Chapman v. United States*, 365 U.S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961) (warrantless search of rented premises without tenant's consent violated Fourth Amendment despite consent of landlord).

safety codes are "significant intrusions upon the interests pro-
tected by the Fourth Amendment"[36] and that residents who do
not consent to such an inspection have "a constitutional right
to insist that the inspectors obtain a warrant," absent exigent
circumstances.[37] *Camara* also suggested that when the tenant
has not consented and there are no exigent circumstances,
officials must obtain an inspection warrant to lawfully inspect
a residential apartment, regardless of whether the landlord or
building manager has consented. Based on this, we question
whether there are any circumstances under which a landlord
or property manager could provide lawful consent for city
inspectors to enter and inspect residential apartments leased
to others. But we need not answer that question, because, as
we will explain, even assuming that Anderson's prior refusal
was required under § 29-832, we conclude that a violation of
that requirement has no impact on the probable cause finding
to issue an inspection warrant.

[14-17] In discussing the type of probable cause necessary
to support issuance of an inspection warrant, the Court in
*Camara* stated:

> Where considerations of health and safety are involved,
> the facts that would justify an inference of probable
> cause to make an inspection are clearly different from
> those that would justify such an inference where a crimi-
> nal investigation has been undertaken. Experience may
> show the need for periodic inspections of certain facili-
> ties without a further showing of cause to believe that
> substandard conditions dangerous to the public are being
> maintained. The passage of a certain period without
> inspection might of itself be sufficient in a given situa-
> tion to justify the issuance of a warrant. . . .
>
> . . . [I]t is obvious that probable cause to issue a war-
> rant to inspect must exist if reasonable legislative or

---

[36] *Camara, supra* note 2, 387 U.S. at 534.

[37] *Id.*, 387 U.S. at 540.

administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (*e. g.*, a multi-family apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling. . . . The [inspection] warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted [inspection] warrant.[38]

[18] Post-*Camara*, the U.S. Supreme Court has generally recognized that probable cause to justify issuance of an inspection warrant can be based either on a showing of "specific evidence of an existing violation"[39] or on a more general showing that "'reasonable legislative or administrative standards for conducting an [area] inspection'"[40] have been satisfied. And a leading Fourth Amendment commentator observes that when an inspection warrant is sought for an entire area, "*Camara* permits a finding of probable cause upon more general facts, such as the passage of time, the nature of the building, or the condition of the area."[41]

---

[38] *Id.*, 387 U.S. at 538-39 (internal quotation marks omitted). Accord *See v. City of Seattle, supra* note 2, 387 U.S. at 545 (holding probable cause to issue administrative inspection warrant of commercial building is governed by "a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved").

[39] *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978).

[40] *Id.*

[41] 5 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 10.1(c) at 20 (6th ed. 2020).

Applying these principles from *Camara* to the record here, we note the housing inspector's affidavit sought an inspection warrant for the entire area of Yale Park. The affidavit recounted Anderson's admission that he had been "lackadaisical" in completing requested maintenance and repairs at Yale Park, and it referenced natural gas leaks in several units and "code violation complaints detailing major health and safety violations on 84 out of the 100 units." The affidavit described the general nature of those suspected code violations based on information obtained from citizens and tenant advocates. Based on these averments and using the "reasonable cause" language of § 29-833, the issuing court determined there was "reasonable cause to believe that the [Yale Park] Property is being occupied in violation of [OMC] sections dealing with property maintenance" and that the property was a "public health hazard in violation of the [OMC]." On appeal to this court, Anderson does not challenge the sufficiency of this probable cause finding, and we agree the affidavit provided sufficient probable cause under *Camara* to support issuing the warrant. And because no one suggests otherwise in this case, we assume without deciding that "reasonable cause" under § 29-833 is satisfied if probable cause under *Camara* is satisfied.

But because Anderson challenges the constitutional validity of the inspection warrant based solely on the affidavit's omission of information regarding compliance with the prior refusal requirement, the question we must answer is whether, viewed under the totality of the circumstances, an affidavit that included the omitted information would still establish probable cause for an inspection warrant under *Camara*.[42] In other words, if the housing inspector had truthfully averred

---

[42] See *Short, supra* note 21, 310 Neb. at 126, 964 N.W.2d at 308 (explaining that court "reexamines the affidavit after deleting the false or misleading statement and including the omitted information" and then determines "whether, viewed under the totality of the circumstances, it still establishes probable cause").

that before requesting the inspection warrant, he had not asked anyone at Yale Park for consent to inspect and no such request had been refused, would the affidavit still have established sufficient probable cause under *Camara* to authorize issuance of the inspection warrant? We conclude it would, because as we explain next, we do not read *Camara* to suggest that prior refusal of consent is a constitutional prerequisite to issuing a valid inspection warrant.

### (c) No Fourth Amendment Requirement to Show Prior Refusal

The *Camara* majority referenced the practice of asking for consent to inspect before seeking a warrant when it made the following observation:

> [M]ost citizens allow inspections of their property without a warrant. Thus, as a practical matter and in light of the Fourth Amendment's requirement that a warrant specify the property to be searched, it seems likely that warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry. Similarly, the requirement of a warrant procedure does not suggest any change in what seems to be the prevailing local policy, in most situations, of authorizing entry, but not entry by force, to inspect.[43]

Two things about this quote are worth highlighting. First, this observation was not part the discussion in *Camara* of the quantum of probable cause necessary to support issuance of an administrative inspection warrant. Rather, it was in a section of the opinion responding to concerns raised by the dissent that imposing a warrant requirement on administrative inspections would be unduly burdensome and would frustrate prompt inspections. Understood in context, *Camara* referenced the practice of asking for consent to inspect before

---

[43] *Camara, supra* note 2, 387 U.S. at 539-40.

seeking a warrant not because it is a constitutional prerequisite to issuance of a valid inspection warrant, but because it is a practical step that will often eliminate the need to seek a warrant at all.[44] Second, to the extent *Camara* can be read to endorse the practice of seeking an inspection warrant only after consent to inspect has been refused, it expressly excluded circumstances where "there has been a citizen complaint" or where "there is other satisfactory reason for securing immediate entry."[45]

Although *Camara* plainly held that residents cannot, consistent with the Fourth Amendment, be compelled to consent to a warrantless search of their property to ascertain compliance with health and safety codes, we do not read *Camara* to hold that residents have a constitutional right to be asked for and refuse consent before an inspection warrant may be issued. We are not alone in this conclusion.[46]

In *State v. Jackowski*,[47] the Wisconsin Court of Appeals addressed a constitutional challenge to the validity of an inspection warrant that, like the one issued here, was based on an affidavit that did not contain a statutorily-required showing that "'consent to entry for inspection purposes has been refused.'" While executing the warrant, officials observed criminal firearms violations, and the homeowner was later prosecuted for such violations. He moved to suppress the

---

[44] See, generally, *State v. Jackowski*, 247 Wis. 2d 430, 441, 633 N.W.2d 649, 655 (Wis. App. 2001) (reasoning that under *Camara*, refusal of consent to inspect is not constitutional requirement, so "lack of an averment that consent to inspect had been refused is a statutory violation only, not an omission of constitutional dimension requiring suppression as a remedy"), *abrogated on other grounds, State v. Popenhagen*, 309 Wis. 2d 601, 749 N.W.2d 611 (2008).

[45] *Camara, supra* note 2, 387 U.S. at 540.

[46] See *Jackowski, supra* note 44.

[47] *Id*. at 440, 633 N.W.2d at 655 (quoting Wis. Stat. Ann. § 66.0119(2) (West 2014), which required inspection warrants to be issued "only upon showing that consent to entry for inspection purposes has been refused").

evidence, arguing that the inspectors' failure to comply with the statutory requirement of showing prior refusal rendered the inspection warrant constitutionally invalid.[48] The court in *Jackowski* disagreed, reasoning:

> We have discussed above the Fourth Amendment standard for the issuance of administrative inspection warrants, and a refusal of consent is not within it. When the Supreme Court noted in *Camara* that "it seems likely that warrants should normally be sought only after entry is refused," it was not discussing the requirements for warrant issuance. The Court was simply explaining, at the end of its opinion, why its holding would not prove unduly burdensome to municipal building code enforcement. . . . Thus, we conclude that the lack of an averment that consent to inspect had been refused is a statutory violation only, not an omission of constitutional dimension requiring suppression as a remedy. Finally, we note that [the Wisconsin statute requiring refusal of consent] does not specifically require suppression of any evidence obtained in violation of its provisions.[49]

*Jackowski* thus concluded the inspection warrant was valid because the affidavit showed sufficient probable cause under *Camara*, and it held that no Fourth Amendment violation resulted from the failure to comply with Wisconsin's prior refusal statute.

[19] We agree with this reasoning and conclude that although there may be sound public policy reasons for requiring inspectors to show that consent to inspect was refused before seeking an inspection warrant, chief among them reducing the number of inspection warrant applications that must be prepared by inspectors and reviewed by courts, such a prerequisite is neither compelled by the Fourth Amendment nor necessary to

---

[48] *Jackowski, supra* note 44.

[49] *Id*. at 441, 623 N.W.2d at 655.

establish probable cause under *Camara* or reasonable cause under § 29-833.[50]

[20] Not every violation of a state law restricting searches is sufficient to show a Fourth Amendment violation.[51] And having reexamined the record to determine whether the omitted information was material to the probable cause finding here, we conclude it was not. Probable cause for an area inspection of Yale Park was plainly supported by Anderson's admission to inspectors that he had been "lackadaisical" in responding to maintenance requests and by multiple citizen complaints describing serious health and safety code violations in nearly all of the 100 residential units of Yale Park.

Viewing the matter under the totality of the circumstances, we appreciate no way in which it would have impacted the court's probable cause determination to know that before seeking an inspection warrant, inspectors had not asked anyone at Yale Park for consent to inspect, nor had anyone refused such a request. Because the information omitted from the affidavit was not material to the probable cause finding, the omission did not render the inspection warrant constitutionally invalid or provide a constitutional basis for suppressing evidence discovered in the inspection.[52] To the extent the county and district courts determined otherwise, they erred.

But this is not the end of our suppression analysis, because we understand Anderson to argue that, even without a Fourth

---

[50] See *id.*

[51] See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014). See, also, *State v. Hoehn*, 316 Neb. 634, 6 N.W.3d 487 (2024). Accord 2 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 4.12 at 1035 (6th ed. 2020) (observing that many jurisdictions have imposed, by statute or court rule, requirements upon warrants going beyond those required by Fourth Amendment and that "these requirements are not deemed to flow so directly from the Fourth Amendment's proscription upon unreasonable searches that failure to abide by them compels exclusion of evidence obtained in execution of a search warrant").

[52] See, *Knutson, supra* note 51; *Hoehn, supra* note 51; 2 LaFave, *supra* note 51.

Amendment violation, a violation of § 29-832 triggers the remedy of suppression. We consider that argument next and find it has no merit.

### (d) Violation of § 29-832 Does
### Not Require Suppression

[21] Absent a constitutional violation, a court will normally suppress evidence obtained in violation of a rule or statute only if the governing law provides that remedy.[53] Anderson does not direct us to any statute or ordinance requiring the suppression of evidence obtained pursuant to an inspection warrant issued without the showing of prior refusal required by § 29-832, and we are aware of none.

[22] We have already explained that *Camara* did not recognize a constitutional requirement that inspectors must ask for consent to inspect and be refused before seeking an inspection warrant.[54] We now hold that in the absence of a constitutional violation or a statute requiring suppression, the failure to comply with the prior refusal requirement in § 29-832 is a technical irregularity that does not affect a substantial right and does not require suppression.[55]

That said, we do not condone the failure to comply with the prior refusal provisions of § 29-832, even in a large residential apartment complex like Yale Park where compliance may require inspectors to contact hundreds of tenants before seeking an area inspection warrant. If inspectors believe the prior refusal requirement in § 29-832 is unnecessarily impairing their ability to ascertain compliance with health and safety codes in residential or commercial buildings with multiple tenants, they can seek appropriate amendments through the legislative process. But currently, except for "emergency

---

[53] *Knutson, supra* note 51.

[54] *Camara, supra* note 2.

[55] See, e.g., Neb. Rev. Stat. § 29-823 (Reissue 2016) ("[n]o evidence shall be suppressed because of technical irregularities not affecting the substantial rights of the accused").

situations" where no warrant or consent is required,[56] the Legislature has mandated that inspection warrants "shall be issued only upon showing that consent to entry for inspection purposes has been refused."[57] Neither inspectors nor courts are free to disregard this requirement.

Here, the affidavit plainly contained no such showing, and for reasons that are not entirely clear from the appellate record, the county court issued the inspection warrant anyway. This was a technical violation of § 29-832, but not a constitutional violation, and Anderson has shown no way in which the violation affected his substantial rights. The inspection warrant was based upon an affidavit that established probable cause under *Camara* and otherwise satisfied the requirements for issuance of an inspection warrant under § 29-833.

On this record, and under this statutory scheme, an otherwise valid inspection warrant issued without the required showing of prior refusal under § 29-832 does not require suppression. To the extent the lower courts concluded otherwise, they erred.

[23] Of course, both the county court and the district court ultimately overruled Anderson's motions to suppress using different reasoning, and a correct result will not be set aside merely because the wrong reasoning was applied.[58] Although our reasoning differs from that applied by the district court, we affirm its decision to affirm the county court's overruling of Anderson's motions to suppress. We reject Anderson's first assignment of error, and our dispositional path makes it unnecessary to address his other suppression arguments.

---

[56] § 29-832. Accord *Camara, supra* note 2, 387 U.S. at 539 (emphasizing that "nothing [stated in *Camara*] is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations").

[57] § 29-832.

[58] See *State v. Kolbjornsen*, 295 Neb. 231, 888 N.W.2d 153 (2016) (appellate court will not set aside correct result merely because lower court applied wrong reasoning).

### 2. Sufficiency of Evidence

All of Anderson's remaining assignments of error challenge the sufficiency of the evidence supporting his four convictions of violating OMC § 48-53, which, as stated, provides in relevant part:

> Any person who knowingly fails to comply with a section of [the OMC] or with a notice of violation or order served in accordance with [the OMC] for a period of at least 90 days after such service shall be deemed guilty of a misdemeanor and be punished as provided in section 1-10 of [the OMC].

We generally agree with the lower courts that the material elements the State was required to prove, beyond a reasonable doubt, with respect to each count charging a violation of OMC § 48-53, were that (1) the alleged code violation existed on the Yale Park property, (2) notice of such code violation was served in accordance with the OMC, (3) Anderson was either the owner of Yale Park or a person responsible for maintenance of the premises, and (4) Anderson knowingly failed to comply with a section of the OMC, or with the notice of violation or correction order, for a period of at least 90 days after service.

We do not understand Anderson to argue there was insufficient evidence of the underlying code violations at Yale Park. Instead, he presents several interrelated arguments challenging the sufficiency of the evidence regarding the second, third, and fourth elements. We address each of these arguments in turn and ultimately reject them all.

### (a) Evidence Was Sufficient to Prove Violation Notices Were Served in Accordance With OMC

Anderson contends the evidence was insufficient to show that the violation notices and correction orders were served in accordance with the OMC. First, he argues the evidence of service was insufficient because the notices and correction

orders were "specifically and solely directed to AB Realty and did not mention Anderson's name."[59] Alternatively, he argues there was insufficient evidence of the mailing process and, thus, "[t]he State failed to prove that the Notices were served upon Anderson or anyone else pursuant to OMC § 48-63."[60] To address these arguments, we first recall the pertinent notice and service provisions of the OMC.

As relevant here, OMC § 48-61 provides, "Whenever the code official determines that there has been a violation of [the OMC,] notice shall be given to the owner or the person or persons responsible." And OMC § 48-63 provides that a violation notice "shall be deemed to be properly served if a copy thereof is . . . [s]ent by certified or first-class mail addressed to the last-known address."

To the extent Anderson contends the evidence was insufficient because it showed the violation notices were "directed to AB Realty and did not mention Anderson's name,"[61] we disagree. OMC § 48-61 plainly authorizes officials to give notice of code violations to either "the owner or the person or persons responsible therefore [sic]," and therefore, violation notices directed to AB Realty, the entity that owned Yale Park, complied with this provision.

We also reject Anderson's contention that evidence of the process by which the violation notices were mailed was insufficient to show compliance with the OMC. The chief housing inspector testified that within 2 weeks of executing the inspection warrant, he prepared, reviewed, and signed the violation notices and then provided them to his administrative staff, who sent them via first-class mail pursuant to regular office procedure. He testified that all notices were addressed to "AB Realty at 2400 North 34th Avenue, Apartment No. 24," in

---

[59] Brief for appellant at 32.

[60] *Id*. at 35.

[61] *Id*. at 32.

Omaha, which was Anderson's last-known address. All subsequent notices were sent using the same procedure.

As such, the State adduced evidence showing that all violation notices were "[s]ent by certified or first-class mail addressed to the last-known address"[62] of either "the owner or the person or persons responsible therefore [sic]."[63] The evidence was undisputed that no notice was returned as undelivered, and at trial, Anderson's wife admitted the notices were received. This evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the violation notices and correction orders were served in accordance with the OMC. Anderson's arguments to the contrary are meritless.

### (b) Evidence Was Sufficient to Prove Anderson Was Responsible for Maintenance of Yale Park

Anderson generally contends that because Yale Park was owned by AB Realty, that entity alone was "responsible for both maintenance of Yale Park and compliance with"[64] the violation notices and correction orders. He suggests there is "no basis" under the OMC to hold him responsible for correcting code violations that "were not directed toward him and pertained to apartments that he did not own."[65] We disagree.

Although the OMC authorizes a process whereby corporations can be punished for violating or failing to comply with any provision of the OMC,[66] the same ordinance also expressly provides, "This section shall not relieve any officer or agent of such corporation from prosecution and punishment in case such officer or agent has violated or fails to comply with any

---

[62] OMC § 48-63.

[63] OMC § 48-61.

[64] Brief for appellant at 32.

[65] *Id*. at 33.

[66] Omaha Mun. Code, ch. 1, § 1-11 (1980).

provision of [the OMC] or any ordinance."[67] Additionally, OMC § 48-12 plainly provides that "the owner *or the owner's designated agent* shall be responsible for the maintenance of buildings, structures and premises." (Emphasis supplied.)

There was ample evidence adduced at trial showing that, at all relevant times, Anderson was both the manager of AB Realty and its designated agent responsible for the maintenance of the buildings, structures, and premises at Yale Park. There was also evidence that Anderson held himself out to housing inspectors, to tenants, and to Omaha's property management appeals board as the person responsible for remedying code violations at Yale Park, both before and after the initial violation notices and correction orders were issued. This evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Anderson was the owner's designated agent responsible for maintenance at Yale Park and "the person or persons responsible" within the meaning of OMC § 48-61. There is no merit to Anderson's claim that the evidence was insufficient to prove he was responsible for complying with the violation notices and correction orders.

(c) Evidence Was Sufficient to Show
Anderson Knowingly Failed to Comply
With Correction Order for Period of
at Least 90 Days After Service

Finally, Anderson argues the evidence was insufficient to prove that he knowingly failed to comply with a violation notice or correction order for a period of at least 90 days after service. As a general proposition, we have said that "to commit an act knowingly, the defendant must be aware of what he is doing."[68] Anderson does not contend that he was unaware of the code violations, the violation notices, or the correction

---

[67] *Id*.

[68] *State v. Lotter*, 255 Neb. 456, 523, 586 N.W.2d 591, 636 (1998).

orders. Instead, he contends the evidence was insufficient because (1) it did not show the specific dates on which the initial correction orders were served, (2) the correction orders did not afford him a reasonable opportunity to abate the violations, and (3) he was "never informed . . . which of the 2,000 violations would result in criminal charges."[69] We address each of these arguments in turn and ultimately reject them all.

### (i) Evidence Was Sufficient to Determine 90-Day Period

Anderson argues the 90-day period for abating the code violations in OMC § 48-53 "could have only commenced from the date service was perfected," and he contends "[t]he State never proved when that clock started . . . so [it] also never proved that Anderson willfully failed to comply with the [notices or orders] within 90 days."[70]

OMC § 48-63 states that a violation notice is deemed "served" if a copy thereof is "[s]ent by certified or first-class mail." The initial violation notices were dated October 5, 2018, and were sent via first-class mail in the normal course of business to Anderson's last-known address. Although no specific mailing date was identified, the evidence was undisputed that the notices were mailed within 2 to 3 weeks after the inspection warrant was executed on September 20. As such, the evidence was sufficient for a reasonable finder of fact to conclude the initial violation notices were served as early as October 5 and no later than October 11.

The evidence also showed that during the reinspection on February 27, 2019, the four violations on which Anderson's convictions are based had not yet been abated. At that point, more than 4 months had elapsed from the time the initial notices and orders were served. This evidence, construed in

---

[69] Brief for appellant at 15.

[70] *Id.* at 34.

the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that Anderson knowingly failed to comply with the initial violation notices and correction orders for a period of at least 90 days after service.

### (ii) Reasonableness of Abatement Period
### Is Immaterial to Violation
### Under OMC § 48-53

Anderson argues that he could not have knowingly failed to comply with the violation notices and correction orders, because the correction orders did not allow him a reasonable period of time to make the required repairs in the first instance. As relevant to this argument, Anderson points out that OMC § 48-62(4) requires that a violation notice must "[i]nclude a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the provisions of [the OMC]."

Here, the initial correction orders allowed Anderson 30 days to make the necessary repairs, and the additional 30-day extensions allowed in the second and third sets of correction orders gave him a total period of 90 days to abate the underlying code violations that resulted in his four convictions. Anderson does not dispute that the abatement periods allowed in these correction orders were consistent with the "reasonable time" periods set out in the table contained within OMC § 48-62(4). Instead, he points out that several witnesses, including housing inspectors, testified that he could not have remedied all 2,000 code violations within 90 days, or even within 120 days. But even assuming these witnesses were correct, we are not persuaded that the reasonableness of the abatement period allowed pursuant to OMC § 48-62(4) has any bearing on whether there has been a violation of OMC § 48-53.

[24-27] When analyzing a municipal ordinance, Nebraska courts apply the same rules of construction as those applied

to statutory analysis.[71] A penal statute is to be given a sensible construction in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served.[72] When interpreting an ordinance, our analysis begins with the text.[73] When the words are plain, direct, and unambiguous, courts are to give the language its plain and ordinary meaning.[74] It is not within the province of the courts to read meaning into an ordinance that is not there or to read anything direct and plain out of an ordinance.[75]

Applying these principles of construction, we must reject Anderson's contention that the plain language of OMC § 48-53, which makes it a misdemeanor to knowingly fail to comply with a notice of violation or correction order "for a period of at least 90 days after such service," must be read to include the qualification that no violation can occur unless the abatement period allowed in the order was reasonable and unless all required repairs could reasonably be completed within that 90-day period. Doing so would require that we read language into the ordinance that is not there and would be inconsistent with other provisions of the OMC.

Although OMC § 48-53 makes noncompliance with the service requirements of OMC § 48-63 an element of the offense, it contains no similar provision referencing the abatement periods set out in OMC § 48-62(4); nor is there any other language in OMC § 48-53 suggesting that to prove a violation of OMC § 48-53, the prosecution must prove it was possible to complete all required repairs within 90 days after service of the notice and order. This is likely because the OMC

---

[71] See *Walsh v. City of Omaha Police & Fire Ret. Sys.*, 277 Neb. 554, 763 N.W.2d 411 (2009).

[72] See *State v. Johnson*, 310 Neb. 527, 967 N.W.2d 242 (2021).

[73] See *State v. Taylor*, 310 Neb. 376, 966 N.W.2d 510 (2021).

[74] *Id.*

[75] See *id.*

authorizes abatement periods ranging from 30 to 240 days, depending on the nature of the violation and the number of extensions allowed.[76]

When enacting OMC § 48-53, the city of Omaha could have made it a crime to "fail to complete the repairs necessary to bring the property into compliance with the provisions of the OMC within the time allowed in the correction order." Or it could have made it a crime to "fail to complete, within a reasonable period of time, the repairs necessary to bring the property into compliance within the provisions of the OMC." It did neither. Instead, it made it a crime to "fail[] to comply . . . with a notice of violation or order served in accordance with [the OMC] for a period of at least 90 days after such service." As such, it appears that a violation of OMC § 48-53 can occur even before the expiration of the total abatement period allowed in a particular case, particularly if the evidence shows there was no reasonable attempt to even begin making the required repairs for a period of at least 90 days after service.

Stated differently, it is the failure to comply with the violation notice or correction order for a period of 90 days after service that is criminalized by OMC § 48-53, and such a failure can be shown regardless of the amount of time ultimately allowed to make the necessary repairs and regardless of the time reasonably required to complete them. Further support for this conclusion is found in OMC § 48-102, which provides that although an appeal to the board will stay administrative enforcement of a notice and order until the appeal can be heard, it "shall not stay the criminal prosecution of any violation of any section of [the OMC]."

Here, the evidence showed that when inspectors served the third set of correction orders providing an additional 30 days to abate the underlying code violations identified in the original notices and orders, they also sent a letter stating in part:

---

[76] See OMC § 48-62(4) and table.

During the next reinspection, if progress is seen and work is completed in a timely and workmanlike manner, citations may not be issued and an extension to abate the remaining violations may be granted. However, if progress is not made to abate the remaining violations, criminal citations will be issued.

The evidence also showed that at the next reinspection, which occurred well beyond the 90-day period, the inspector observed that no repairs had been started with respect to the four underlying code violations alleged in counts X, XI, XV, and XVII. This evidence, construed in the light most favorable to the prosecution, is sufficient for a rational trier of fact to conclude that Anderson knowingly failed to comply with the violation notice and correction orders for a period of at least 90 days after service.

### (iii) Number of Violations to Be Corrected Is Immaterial to Violation Under OMC § 48-53

Finally, Anderson argues that he could not knowingly have failed to comply with the correction orders, because inspectors "never informed Anderson which of the 2,000 violations would result in criminal charges."[77] The district court rejected this argument, reasoning that Anderson was "attempting to take advantage of the magnitude of violations present at his property to avoid prosecution by arguing that since there were a large number of violations, he cannot be responsible for any individual violations not corrected within the relevant time period." The district court emphasized that despite Anderson's receiving three sets of violation notices and correction orders between October 2018 and January 2019, there was "no evidence [Anderson] even attempted to start [any] repairs until shortly before the City charged him."

---

[77] Brief for appellant at 15.

We agree with the district court's reasoning. Regardless of the number of violations with which Anderson was charged, the evidence at trial showed, with respect to counts X, XI, XV, and XVII, that he had not even begun to make repairs more than 4 months after the violation notices and correction orders were served. This evidence was sufficient to prove that he knowingly failed to comply with the violation notices and correction orders for a period of at least 90 days after service.

## V. CONCLUSION

For the foregoing reasons, we find no reversible error in the decision of the district court. We therefore affirm Anderson's convictions and sentences.

Affirmed.